**Carl Wayne BUNTION, Appellant**

**v.**

**The STATE of Texas**

**NO. AP–76,769.**

Court of Criminal Appeals of Texas.

DELIVERED: January 27, 2016

. Patrick F. McCann, Houston, for Appellant.

Clinton Morgan, Assistant District Attorney, Houston, Lisa C. McMinn, State's Attorney, Austin, for the State.

1. Unless otherwise indicated, all references to Articles refer to the Code of Criminal Proce-

## OPINION

Richardson, J., delivered the opinion for a unanimous Court.

In January 1991, a jury convicted appellant of capital murder for an offense committed in June 1990. TEX. PENAL CODE § 19.03(a)(1) (West 1990). Based upon the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. TEX.CODE CRIM. PROC. art. 37.071, § 2(g) (West 1990).[1] His conviction and sentence were affirmed on direct appeal. *Buntion v. State*, No. AP–71,238 (Tex.Crim.App. May 31, 1995) (mem. op., not designated for publication). Appellant's initial state application for habeas corpus relief was denied. *Ex parte Buntion*, No. WR–22,-548–02 (Tex. Crim. App. Nov. 5, 2003) (per curiam order, not designated for publication). Appellant's subsequent application was granted, and the case was remanded for a new punishment hearing. *Ex parte Buntion*, No. AP–76,236, 2009 WL 3154909 (Tex.Crim.App. Sept. 30, 2009) (mem. op., not designated for publication).

The trial court held a new punishment hearing in February 2012. Based on the jury's answers to the special issues, the trial judge sentenced appellant to death. Art. 37.0711, § 3(g). Direct appeal to this Court is automatic. Art. 37.0711, § 3(j). Appellant raises twenty-seven points of error. After reviewing appellant's points of error, we find them to be without merit. Consequently, we affirm the trial court's sentence of death.

## SUFFICIENCY OF THE EVIDENCE

■ In point of error twenty-seven, appellant asserts that the evidence was insuf-

dure.

ficient to sustain the jury's affirmative answer to the future dangerousness special issue. Appellant states that, like the defendant in *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007), there is no evidence that he poses a future danger while in prison. He argues that, given his age, the only relevant society is prison society. He notes that his criminal record, though extensive, dates from the 1980s. Appellant states that he is now in his mid-sixties, and if he received a life sentence, he would not even be eligible for a parole review for many years. He avers that he would likely die of natural causes while in prison before reaching his first parole review date. Appellant points out that he has been "quiet and relatively complacent" since he was convicted of the instant offense over twenty years ago, and "he is now an old man" in poor health. He alleges that the State presented no psychological, opinion, or reputation evidence that would permit a rational juror to conclude that he is likely to commit future acts of violence. Therefore, appellant reasons, the evidence is not sufficient to allow a rational juror to determine, beyond a reasonable doubt, that there is a probability that he will commit criminal acts of violence and constitute a continuing threat to society.

■ We view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future dangerousness issue was "yes." *Martinez v. State*, 327 S.W.3d 727, 730 (Tex. Crim. App. 2010). A jury may consider a variety of factors when determining whether a defendant will pose a continuing threat to society. *Freeman v. State*, 340 S.W.3d 717, 725 (Tex. Crim.

App. 2011); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

■ The facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness. *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim. App. 2008). In this case, the facts of appellant's offense alone were sufficient to establish appellant's future dangerousness. His victim, James Irby, was a motorcycle police officer who made a traffic stop of a vehicle in which appellant was a passenger. While Irby and the vehicle's driver were standing and talking next to the vehicle, appellant exited the vehicle carrying a loaded gun. Appellant shot Irby once in the head, causing him to fall to the pavement. While Irby was lying on the ground, appellant shot him twice in the back.

Appellant fled the scene on foot and committed several violent offenses during his efforts to evade capture. Appellant attempted to steal a car that was waiting at a stop sign by standing in front of the vehicle and pointing a gun at the driver. As the driver began to back the car away, appellant fired a shot into the windshield. The bullet shattered the windshield, sending broken glass into the driver's eyes, and struck the passenger in the arm. When a peace officer who had come upon the scene commanded appellant to halt, appellant shot at the officer and ran down the street.

Appellant then walked into a nearby warehouse, where he pointed his gun at an employee, who ran outside. Appellant chased a second employee into the parking area. A supervisor who was pulling into the driveway saw appellant and confronted him. Appellant pointed his gun at the supervisor's face and directed him to put his hands up, give appellant his wallet, and get on the ground. Appellant then attempted to steal the supervisor's vehicle. However, when appellant could not operate the standard transmission, he

abandoned the vehicle and ran inside a building, where a responding police officer arrested him.

■ A jury may also infer a defendant's future dangerousness from evidence showing a lack of remorse. *See Estrada v. State*, 313 S.W.3d 274, 284–85 (Tex. Crim. App. 2010) (citing *Trevino v. State*, 991 S.W.2d 849, 853–54 (Tex. Crim. App. 1999)). Here, appellant's conduct immediately after his arrest indicated that he lacked remorse for the offense. He refused to give the arresting officer his name or any other information and claimed that he was diabetic and paralyzed. While in the police station following his arrest, appellant was uncooperative and appeared to be "mad at everybody." The jury also heard evidence confirming appellant's continued lack of remorse. During a 2009 recorded interview with a television reporter following the reversal of his initial sentence, appellant stated that his conduct in committing the offense was justified because he had no doubt that the victim was going to shoot him. Appellant also stated that if he were faced with the same situation today, he would do it again.

Appellant's prior criminal record also supported the finding that appellant posed a continuing threat to society. *Se Solomon v. State*, 49 S.W.3d 356, 363 (Tex. Crim. App. 2001) (noting that the existence of a prior criminal record and the severity of the prior crimes is a factor to consider in determining whether a defendant constitutes a continuing threat to society). Appellant had thirteen prior felony convictions, many of which involved assaulting other people. Most notably, appellant was convicted in 1965 of "assault to murder" an Alabama peace officer. Further, appellant committed the instant offense a little over a month after he was released to parole while serving a sentence for the offense of sexual assault of a child. *See id.* at 363–64

(stating that committing an offense while on parole has some tendency to show future dangerousness).

In addition, appellant committed numerous unadjudicated extraneous offenses and bad acts, both in and out of prison. During a previous term of imprisonment, appellant was found to be in possession of a shank. While on a prison furlough, appellant used his brother's birth certificate to obtain a visit with his ex-wife, who was in jail. When a jail official discovered appellant's true identity and the fact that he was on a prison furlough, the official arrested appellant and returned him to prison. Approximately a week before the instant offense, appellant showed an acquaintance a gun. He told her that he always carried it because he would rather kill than go back to prison. While in jail for the instant offense, appellant threatened other detainees who asked him why he was there. Appellant said that he would kill them "like [he] killed the cop" if they did not leave him alone.

Additional evidence indicated that appellant's character for violence had not changed during his time in prison. *See, e.g., Coble v. State*, 330 S.W.3d 253, 269 (Tex. Crim. App. 2010). While in jail awaiting the punishment retrial, appellant wrote letters to his brother, Bobby. The letters contained language from which a jury could reasonably infer that appellant remained a continuing threat to society. For example, in a July 2011 letter, appellant stated that he was glad that he would never be released from prison because he would "hate to think about what [he would] do to certain people that have screwed [him] around." In an August 2011 letter, appellant advised Bobby that if the district attorney questioned Bobby about Bobby's previous criminal record, Bobby should just say that the district attorney "made [Bobby] what [he was]" by sending Bobby

to prison on his first offense instead of giving him probation. "If they create a 'monster,' they should not complain when it feeds (on society.) right? [sic] Right."

Dr. Mark Vigen, appellant's mental health expert, acknowledged that appellant had served "a lifetime of prior prison sentences" before he committed the instant offense. Vigen acknowledged that appellant's criminal history and history of imprisonment could increase the risk for prison violence. Further, the jury had heard evidence that appellant was a member of the Aryan Brotherhood of Texas prison gang. Vigen testified that membership in a prison gang is associated with an increased probability of prison violence. Vigen was also aware that appellant was in his mid-forties at the time he committed the instant offense. He acknowledged that it was anomalous for a person of that age to commit such a violent offense.

We reject appellant's argument that, as the future dangerousness issue applied to him, the only relevant society was prison society. *See Lucio v. State*, 351 S.W.3d 878, 902–03 (Tex. Crim. App. 2011) (stating that future dangerousness issue asks a jury to determine whether a capital defendant would be dangerous "whether in or out of prison," without regard to the time he would actually spend in prison if sentenced to life). His good behavior in prison over the past twenty years did not preclude a finding of future dangerousness. *Se Hunter v. State*, 243 S.W.3d 664, 673 (Tex. Crim. App. 2007); *Bible v. State*, 162 S.W.3d 234, 245 (Tex. Crim. App. 2005). The evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that there was a proba-

bility that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See Hunter*, 243 S.W.3d at 673; *see also McGinn v. State*, 961 S.W.2d 161, 168–69 (Tex. Crim. App. 1998) (stating that once the rationality of the future-dangerousness prediction is established, it is impossible to determine whether the prediction is nevertheless wrong or unjust because of countervailing evidence). Point of error twenty-seven is overruled.

### JUROR DISABILITY

In points of error one through three, appellant argues that the trial court abused its discretion by not disqualifying, excusing, or removing juror, Kristi Kotsatos, due to her psychological instability, in violation of Article 36.29.[2] Appellant argues that Kotsatos' testimony demonstrated that she was psychologically crippled by the prospect of serving on his jury, so that she was "absolutely prevented from performing" her duties in this case. Appellant notes that Article 36.29 authorizes a trial court to dismiss a juror who is physically or mentally impaired in a way that hinders her ability to perform her duty as a juror, and he asserts that Kotsatos was such a juror.

During voir dire, Kotsatos explained that her ex-boyfriend had been murdered. She stated that, although they were no longer dating and she was not present at the time of the offense, she did not handle the aftermath of the murder very well. As a result of the experience, including sitting through the murder trial, Kotsatos failed some of her college courses and suffered from clinical depression. She asserted

2. Appellant also argues that the trial court's failure to dismiss Kotsatos violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10, 13, 15, and 19, of the Texas

Constitution. We decline to address his constitutional claims because they are inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Bell v. State*, 90 S.W.3d 301, 305 (Tex. Crim. App. 2002).

that, although nine years had passed since this trauma, she did not wish to be a juror in this case because she would probably would be so distracted by her past experiences that she would be unable to be fair in her ultimate decisions.

Both the State and the defense addressed Kotsatos' mental distress about being a juror on a capital murder trial during individual voir dire. Each side conducted an extensive voir dire of Kotsatos. Kotsatos told the prosecutor that she would be "distracted," and might be biased against appellant, but acknowledged that she would "have no problem answering the questions based on the evidence."

When questioned by defense counsel, Kotsatos expressed a willingness to consider mitigating evidence and base her decisions on the evidence presented, despite her personal feelings about the death penalty and her past experience. Despite Kotsatos' clear expression that she did not want to serve on the jury, both appellant and the State accepted Kotsatos as a juror, and she was informed that she had been selected as a juror on January 23, 2012. Kotsatos did not protest but simply asked about when she was expected to show up for trial. Yet, on February 3rd Kotsatos informed the court coordinator by telephone that she did not feel fit to serve on the jury. The court coordinator informed Kotsatos that she needed to return for jury duty as instructed. On February 7th, Annie McAdams, Kotsatos' sister-in-law and a civil attorney, contacted the court and informed the court by telephone that she believed that Kotsatos' mental state was deteriorating. Based on this phone call with the court, which both the State and the defense witnessed, the court decided to hold a special hearing the next day and question both McAdams and Kotsatos. After the hearing, and after an off-the-record conference among the trial judge and the attorneys for both sides, the court informed Kotsatos that she would remain a juror. Kotsatos did not express any opinion about remaining a juror at that time. The court advised Kotsatos in detail what she should do if at any time during the trial she had further problems or if she had further concerns about being an impartial juror. The record does not reflect any argument from the defense regarding whether or not Kotsatos should remain a juror. The record does not reflect an unambiguous bias against appellant. In fact Kotsatos repeatedly replied that she would consider the evidence and follow the law in response to questions about the special issues she would be required to answer as a juror.

Defense counsel did not challenge Kotsatos for cause, object to the trial court's decision, or otherwise seek to exclude Kotsatos from the jury, either during Kotsatos' individual voir dire or at the special hearing on February 8th. Immediately before the jury was sworn, the trial court asked the parties whether there were any objections to the jury "as seated or selected." Defense counsel responded, "None other than previously stated." Appellant does not assert, and the record does not reflect, that he objected to Kotsatos' jury service at any time during the trial. Therefore, appellant did not preserve this point of error. *See* Tex. R. App. P. 33.1; *State v. Morales*, 253 S.W.3d 686, 697 (Tex. Crim. App. 2008) (stating that the constitutional right to trial by an impartial jury, like any other right, is subject to waiver). Points of error one through three are overruled.

## DISTRICT ATTORNEY'S CONDUCT AND POLICE PRESENCE

In points of error four and five, appellant asserts that the improper actions of the Harris County District Attorney's Of-

fice and the Houston Police Department "so infected the trial that appellant was denied a fair trial," in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.[3] In point of error six, appellant asserts that the trial court abused its discretion and should have granted appellant's motion for change of venue based on Article 31.03[4] and the District Attorney's comments to the local media. Appellant briefs these points together.

Appellant filed three pre-trial motions: Motion to Disqualify Harris County District Attorney's Office; Motion to Change Trial Venue and For Sanctions; and Motion to Dismiss Death Penalty Prosecution or Alternatively, For Appointment of a Prosecutor Pro Tempore Due to Criminal Investigation of Harris County District Attorney's Office. In furtherance of these pretrial motions, appellant issued subpoenas for District Attorney Patricia Lykos and other members of her staff. The trial court quashed the subpoenas and denied each of the pretrial motions. Appellant complains that denial of these pretrial motions and the subsequent prosecution by District Attorney Lykos' Office resulted in a violation of his due process rights. Appellant also specifically cites the denial of the change of venue motion as an abuse of discretion by the trial court based on the statutory requirements of Article 31.03.

We will address the statutory requirements of a change of venue motion first and then address appellant's due process allegations.

### Motion for Change of Venue

■ Appellant filed a pretrial motion for change of venue in which he requested that his trial be moved to Travis County. Appellant complained that District Attorney Patricia Lykos had made a statement to the Houston Chronicle stating that appellant would be released to "mandatory parole" if he received a life sentence. Appellant claimed that Lykos' statement, which was published in the Houston Chronicle on February 8, 2011, made it impossible for him to receive a fair trial in Harris County and violated his right to due process and his Eighth Amendment right to accurate sentencing.

In support of his motion, appellant noted that the Houston Chronicle was the "largest circulating daily in the county" and that the story had received more than eighty online comments. He averred that most of these comments were hostile to appellant, and several of them stated that appellant should receive the death penalty so that he could never be released from prison. Appellant acknowledged that in a follow-up news story published on February 10, 2011, defense counsel pointed out

---

**3.** Appellant also alleges violations of the Texas Constitution, but he does not specify how the protections afforded by the Texas Constitution differ from the protections afforded by the United States Constitution. Therefore, we will not address his Texas Constitutional claims separately. TEX. R. APP. P. 38.1; *Freeman*, 340 S.W.3d at 732.

Appellant's points of error appear to be multifarious. However, in the interest of justice, we will address his arguments as we construe them.

**4.** Appellant's brief states Point of Error Six twice using the following language: "The trial

court's denial of Appellant's Motion for a Change of Venue was an abuse of discretion under Article 35.16, of the Texas Code of Criminal Procedure." However, in the body of appellant's argument he references Article 31.03. Article 35.16 addresses reasons for challenges for cause when striking venire panel members during voir dire. Article 31.03 addresses change of venue upon defendant's motion. We will assume from appellant's arguments rather than his issues presented that he intended to base Point of Error Six upon Article 31.03.

that Lykos' parole statement was incorrect. But appellant alleged that defense counsel's statements had not cured the harm. Appellant noted that the readers' comments that followed this story continued to express a preference for appellant receiving the death penalty.

Appellant emphasized that Lykos had made this statement just weeks before the start of jury selection, so it would be fresh in the minds of prospective jurors. Appellant averred that he had not wanted to mention parole to the jury at all, but based on Lykos' inaccurate statement, he would be compelled to ask potential jurors whether they had seen the media coverage that referenced parole. Appellant noted that this case was already well-known, as shown by the fact that venue for his 1991 trial had been changed due to extensive pretrial publicity. Appellant also filed a subpoena for Lykos to testify at an evidentiary hearing on his motion for change of venue.

 We review a trial court's ruling on a motion for change of venue for an abuse of discretion. *Freeman*, 340 S.W.3d at 724. If the trial court's decision falls within the zone of reasonable disagreement, it will be upheld. *Id.* Article 31.03(a) provides that a trial court may grant a change of venue if the defendant establishes that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial," or that "there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial." Art. 31.03(a). *See also Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007); *Lundstrom v. State*, 742 S.W.2d 279, 281 (Tex. Crim. App. 1986). To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudi-

cial, and inflammatory. *Salazar v. State*, 38 S.W.3d 141, 150 (Tex. Crim. App. 2001). Widespread publicity alone is not inherently prejudicial. *Gonzalez*, 222 S.W.3d at 449; *see also Renteria v. State*, 206 S.W.3d 689, 709 (Tex. Crim. App. 2006). Extensive knowledge of the case or defendant in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage. *Gonzalez*, 222 S.W.3d at 450–51; *Faulder v. State*, 745 S.W.2d 327, 338–39 (Tex. Crim. App. 1987). News stories that are accurate and objective in their coverage are generally considered by this Court not to be prejudicial or inflammatory. *Gonzalez*, 222 S.W.3d at 451.

The record contains photocopies of February 8 and February 10 news stories from the Houston Chronicle as they appeared in print, as well as print-outs of the stories as they appeared online, followed by online reader comments. The print version of the February 8 story was titled, "Death Row Cases Back for Retrial." The online version was titled, "Death row inmates get chance at life in retrials." In both versions of the February 8 story, a sentence in bold-face type underneath the main title referred to a "cop killer" whose sentence could be changed to life. The text identified appellant as a person who had been convicted of "gunning down" a police officer during a traffic stop. It further described appellant's case as "the highest profile case" among "as many as sixteen" capital murder cases in which Lykos anticipated a punishment retrial following the reversal of the death sentence due to flawed jury instructions. In the context of arguing against "potentially crippling budget cuts" for the District Attorney's Office, Lykos stated that she intended to pursue the death penalty again in most of those cases. Lykos explained that, if any of the offenders received a life

sentence, "it is possible that the 'early release' parole provisions of the 80s and 90s would result in mandatory parole." Both versions of the February 8 story included a subheading in bold-face type titled, "Parole board has final say." The text that followed the subheading explained that the Texas Board of Pardons and Paroles, and not a jury, would determine whether a life-sentenced offender would be released to parole. The story also quoted a Houston criminal defense attorney, who asserted that Lykos' statement was inaccurate and that, as a practical matter, no Board member would ever vote to release appellant from prison because any member who did so would not be able to keep his job.

The print version of the February 8 story appeared on the front page of the newspaper. The most prominent story on the front page concerned a crisis in health care funding and featured a large photograph of a doctor standing beside a bedridden patient. In contrast, the story at issue occupied only a two-column-wide space on the front page, and it did not include any pictures. The report continued on an inside page with the title, "Trial: Irby's wife calls new trial a 'nightmare.'" Below this title were small identification photographs (each a half-column's width) of Irby and appellant, and a larger photograph (column's width) of Officer Irby's widow and her father embracing. The online version of the story omitted the inside-page title referring to the quote from Officer Irby's widow and included only the photograph of Officer Irby's widow and her father.

The February 10 follow-up story was titled, "Killer's Defense Wants Trial Moved." In that story, defense counsel said that they were seeking a change of venue due to Lykos' prior statement about early release. They asserted that Lykos' statement was inaccurate because there was no mandatory release for a capital murderer. They also stated that the Board of Pardons and Paroles would never release appellant if he received a life sentence.

In support of his motion for change of venue, appellant requested that the trial court take judicial notice of the 1990 change-of-venue proceedings that led to the initial trial being moved to Fredericksburg. Further, counsel submitted a video of an interview that appellant gave to a local television news reporter following the 2009 reversal of appellant's death sentence. Counsel noted that the interview was readily available online.

In addition, appellant submitted his own affidavit concerning his understanding of the applicable parole law and his inability to receive a fair trial in Harris County. He also submitted affidavits from David Cunningham and David Dow, criminal defense attorneys in Harris County. They opined that Lykos' false statement to the media prejudiced appellant. Cunningham also stated that there was a "dangerous combination" working to deny appellant a fair trial because Lykos, a very influential person in Harris County, had stated a "mistruth" in the local media.

Further, appellant noted that a television news station's website had posted a summary of, and a link to, the February 8 news story. He also presented a print-out of approximately ninety online reader comments responding to that story. Many of the comments expressed general hostility toward capital murderers and displeasure with the fact that the death sentences had been reversed in so many cases. Several comments expressed frustration that a life sentence did not actually mean life in prison because of the availability of early release. However, the comments did not differentiate between the mere possibility

of early release and "mandatory" early release.

Appellant also presented a print-out of online reader comments responding to the February 10 follow-up article. This article received fewer comments than the first article. One commentator stated that Lykos was correct and that appellant's defense counsel ("the vermin who represent the cop killer") were lying. The commentator also said that appellant could be on the street within a very short time if sentenced to life because there had been no life-without-parole option at the time of the offense. Like the comments to the first article, this comment to the February 10 article did not differentiate between the mere possibility of early release and "mandatory" early release.

To rebut appellant's assertion that the number of online comments generated by the February 8 and February 10 articles reflected wide dissemination and high public attention, the State presented print-outs of three recent unrelated Houston Chronicle news stories, followed by a sampling of online reader comments. The prosecutor argued that these print-outs showed that "plain vanilla" news stories received a roughly comparable number of online comments.[5]

The State also presented the transcript from a pretrial hearing in another capital murder punishment retrial in which jury selection had already begun when the February 8 news story was published. The

hearing transcript showed that ten jurors were questioned about their exposure to Lykos' statement concerning early release. Although these jurors had already been instructed to avoid media coverage of that case, the prosecutor argued that their statements during the hearing indicated that many jurors did not read the newspaper at all.[6]

The prosecutor also called Terrance Windham to testify about a defendant's ability to get a fair and impartial jury in a widely publicized case.[7] Windham, who had served as a Harris County assistant district attorney since 1989, explained that the original trial in this case had been moved to Fredericksburg. Windham was aware of very little media coverage since the 1991 trial; the only coverage he had seen were the attachments to appellant's motion. Windham opined that appellant could receive a fair trial in Harris County. He stated that the two Houston Chronicle news articles attached to the motion did not constitute "pervasive coverage" of the case. Further, Windham asserted that the articles were merely informational, and not prejudicial or inflammatory. Windham testified that he was unaware of any "dangerous combination" working to deny appellant a fair trial in Harris County.

On cross-examination, Windham acknowledged that the news media was covering the instant hearing and that he had seen cameras outside the courtroom. Windham stated that he lived in Houston

5. Specifically, a news story about the shooting of two immigration agents in Mexico received over 250 comments; a story covering a "town hall" meeting about Houston Police Department violence received ninety-three comments; and a story about a planned ticket price increase for Astros games received thirty-nine comments.

6. Four jurors stated that they did not subscribe to the Houston Chronicle or read it online. Another juror stated that he did not

subscribe, but he sometimes read the paper online. Two other jurors stated that they subscribed to the Chronicle but they did not read it every day.

7. In addition to Windham, the trial court took judicial notice of the State's affidavits from two additional Harris County Assistant District Attorneys who opined that appellant could receive a fair trial in Harris County.

at the time of the 1990 offense and the 1991 trial. He stated that the case received quite a bit of media coverage at that time, but he did not recall the details. Windham stated that a trial involving the capital murder of a police officer would typically be well-covered in the media. Windham anticipated that the punishment retrial would receive additional media coverage as the trial date approached. Windham acknowledged that Lykos' statement in the February 8 story was inaccurate because Texas does not have "mandatory parole." He agreed that capital murderers are not eligible for any type of mandatory release. Windham testified that he did not know how a potential juror would interpret the term "mandatory parole."

The State also called the Montgomery County District Attorney, Brett Ligon. Ligon testified that, as a defense attorney and as a prosecutor, he had handled cases in Harris and Montgomery Counties that had received extensive media coverage. Ligon opined that despite the media coverage, those trials had been fair. Except for the two news articles attached to appellant's motion, Ligon was not aware of any media coverage of this case following the sentence reversal. In his opinion, those articles did not constitute pervasive, prejudicial, or inflammatory coverage. Ligon acknowledged that "mandatory parole" does not exist in Texas and that this term could mislead potential jurors. He pointed out, however, that both the February 8 and February 10 news articles quoted criminal defense attorneys who stated that Lykos' "mandatory parole" statement was inaccurate.

Ligon also stated that he was unaware of any "dangerous combination" working to deny appellant a fair trial in Harris County. Ligon testified that appellant could have a fair trial in Montgomery County if the motion to change venue were

granted. However, based on his trial experience in both counties, Ligon thought that it would be a better strategy for the defense to try the case in Harris County rather than Montgomery County.

Following this hearing, the trial court denied appellant's motion for change of venue. The court found no evidence of a dangerous combination. The trial court did not abuse its discretion by denying appellant's motion. The affidavits appellant offered in support of his motion contained mere conclusory allegations that Lykos' false statement prejudiced appellant and constituted a dangerous combination working to deny him a fair trial. See Freeman, 340 S.W.3d at 725. The trial court reasonably found them to be unpersuasive.

Further, the trial court reasonably determined that the news coverage of appellant's case was not pervasive, prejudicial, or inflammatory. See id. (concluding that the effects of pretrial publicity were adequately explored through a hearing on the motion to change venue and voir dire, and no prejudice was found); Gonzalez, 222 S.W.3d at 450–51; see also Bell v. State, 938 S.W.2d 35, 46 (Tex. Crim. App. 1996) (finding it significant that the majority of the news coverage about which appellant complained occurred years before the trial). The February 8 news story was accurate and objective. It briefly described the facts of appellant's offense of conviction. It also quoted Officer Irby's widow, who was upset by the prospect of a retrial and the possibility that, if appellant received a life sentence, she and her children might have to go before the Parole Board when his case came up for review. The article clearly explained that the Parole Board would make any release decisions. The story quoted a local defense attorney who stated that, as a practical matter, the Board would never release appellant if he

received a life sentence. The February 10 follow-up news story was also accurate and objective. The story merely reported that appellant's counsel was moving for a change of venue as a result of Lykos' misstatement in the first story. The story contained a quote from defense counsel that there was no mandatory parole and that the Board, and not a jury, would decide whether a life-sentenced offender would be released.

To the extent that appellant relied on a recording of the 2009 interview that he gave to a television news reporter, we note that part of this recording was later played for the jury. Under similar circumstances, we have declined to find that such evidence was prejudicial. *See Gonzalez,* 222 S.W.3d at 452 & n. 29 (concluding that no prejudice resulted from pretrial publication of surveillance video of offense that was later introduced into evidence at trial).

Appellant also appears to complain that any discussion in the media of parole or early release denied him a fair trial because defense counsel's preferred strategy was to avoid mentioning the subject of parole during voir dire. This claim is without merit. *See Feldman v. State,* 63 S.W.3d 416, 433–34 (Tex. Crim. App. 2001) finding parole instructions did not cause appellant egregious harm because parole was not an applicable issue in appellant's capital case. The jury in this case was instructed not to consider any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice ("TDCJ"), or how long appellant would have to serve to satisfy a life sentence. We presume that jurors disregard parole when they are instructed to do so. *Colburn v. State,* 966 S.W.2d 511, 520 (Tex. Crim. App. 1998).

The trial court's decision to deny appellant's motion for change of venue was well within the zone of reasonable disagreement.

### Due Process Violations Resulting from Conduct of District Attorney's Office & Police

#### a) Motion to Disqualify District Attorney's Office

■ Appellant filed a pretrial motion to disqualify the Harris County District Attorney's Office in which he alleged:

(1) The sitting District Attorney, Lykos, was a former Houston police officer.

(2) Appellant was accused of murdering a Houston police officer.

(3) No "cool reflection" was involved in the decision to seek the death penalty after the reversal of appellant's initial death sentence.

(4) There was no evidence of any deliberation in the decision to seek the death penalty against appellant.

(5) Allowing the District Attorney to prosecute this case "would be a mockery of our system of fair justice. The image of Officer Lykos beating the drum of revenge on the steps of the courthouse is not the image of fair play this court stands for."

Appellant also filed subpoenas for Lykos and the lead prosecutor to appear at an evidentiary hearing to address this motion. The State filed motions to quash those subpoenas. At a hearing on the parties' motions, the prosecutor argued that the motion to disqualify did not state a basis for relief that would necessitate an evidentiary hearing. The prosecutor noted that Lykos never knew the victim, Police Officer Irby, and had not worked in the police department at the same time as Irby. Therefore, the prosecutor argued, appellant's argument that Lykos was biased did not merit development at a hearing. Because appellant failed to show the need for

an evidentiary hearing, he could not show any need to compel the subpoenaed witnesses to appear. The prosecutor further stated that, to the extent that the subpoenas sought privileged information and work product that were not relevant to appellant's particular case, appellant's motion did not state a basis for overcoming the privilege.

Defense counsel responded that Lykos made a "knee-jerk" decision to seek the death penalty against appellant a second time. In support, defense counsel pointed out that Lykos had announced her decision to the media one day after appellant had been granted a new trial. Counsel also asserted that Lykos had a natural allegiance to a fellow police officer. The trial court granted the State's motion to quash the subpoenas and denied appellant's request for an evidentiary hearing. The trial court also denied the motion to disqualify the District Attorney's Office.

The standard of review for disqualification of the prosecutor by the trial court is whether the court abused its discretion. *Landers v. State*, 256 S.W.3d 295, 303 (Tex. Crim. App. 2008). The trial court abuses its discretion when its decision lies "outside the zone of reasonable disagreement." *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005). A trial court has limited authority to disqualify an elected district attorney and her staff from the prosecution of a criminal case. The office of a district attorney is constitutionally created and protected; thus, the district attorney's authority "cannot be abridged or taken away." *Landers*, 256 S.W.3d at 303–04; Tex. Const. art. V, § 21; *see also, State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 4 (Tex. Crim. App. 1990). A district attorney is responsible for recusing herself in a particular case to avoid conflicts of interest and the appearance of impropriety. *See Coleman v. State*, 246 S.W.3d 76, 81 (Tex. Crim. App. 2008); *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 5 (Tex. Crim. App. 1990).

Article 2.01 of the Code of Criminal Procedure recognizes that a district attorney "shall represent the State in all criminal cases" except when a district attorney's employment prior to election would be adverse to the prosecution of a particular case. This Court has further limited the reading of Article 2.01 to permit the trial court to disqualify the district attorney only when the conflict of interest rises to the level of a due process violation. *Landers v. State*, 256 S.W.3d 295, 304 (Tex. Crim. App. 2008). In *Landers v. State*, this Court held that the district attorney's prosecution of the defendant, *whom he had previously represented* on a different charge of intoxication assault, did not violate the defendant's right to due process, and thus the district attorney could not be disqualified. The *Landers* Court, drawing on its previous holding in *Ex parte Spain*, reasoned that, since the representation of the defendant was not on the *same case* that the district attorney was now prosecuting, and there was no evidence that the State's attorney used any confidential information in the defendant's prosecution on the current charge, there had been no due process violation, and thus the district attorney could not be disqualified. *Landers*, 256 S.W.3d at 304 n. 21 ("When a district attorney prosecutes someone whom he previously represented in the same case, the conflict of interest is obvious and the integrity of the prosecutor's office suffers correspondingly.") (quoting *Ex parte Spain*, 589 S.W.2d 132, 134 (Tex. Crim. App. 1979)). Although *State ex rel. Eidson v. Edwards*, a mandamus proceeding, held the trial court exceeded its authority by disqualifying a district attorney and his staff from prosecuting a case, the opinion reaffirmed the holdings of *Morgan*

and *Spain* with respect to the rights violations that result from prosecution of a defendant by a prosecutor who previously represented the defendant in the same matter. *Eidson*, 793 S.W.2d at 6–7; *see also Ex parte Morgan*, 616 S.W.2d 625 (Tex. Crim. App. 1981).

Appellant has not alleged, and we have not found, that any actual conflict existed. District Attorney Lykos did not previously represent appellant, nor did any of her staff. Thus, appellant fails to show any conflict which this Court has previously found as grounds for disqualification.

As for Appellant's claim that DA "Lykos [was] beating the drum of revenge on the steps of the courthouse" and was not deliberate in her decision to seek the death penalty, that claim fails as well and is not a basis for disqualification of the district attorney. In an unpublished opinion by this Court, Judge Womack clearly articulates the idea that a prosecutor need not be a neutral party in criminal litigation:

> [A] prosecutor who zealously seeks a conviction is not inherently biased or partial. A prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged. If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means. True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury—not the prosecutor.

*Ex parte Reposa*, 2009 Tex. Crim. App. Unpub. LEXIS 725, 36, 2009 WL 3478455 (Tex. Crim. App. Oct. 28, 2009) (mem. op., not for publication). Judge Womack then goes on to quote the Supreme Court of the United States as support:

> It is true that prosecutors may on occasion be overzealous and become overly committed to obtaining a conviction.

That problem, however, is personal, not structural. . . . [S]uch overzealousness "does not have its roots in a conflict of interest. When it manifests itself the courts deal with it on a case-by-case basis as an aberration. This is quite different from approving a practice which would permit the appointment of prosecutors whose undivided loyalty is pledged to a party interested only in a conviction."

*Ex parte Reposa*, 2009 Tex. Crim. App. Unpub. LEXIS 725, 36, 2009 WL 3478455 (Tex. Crim. App. Oct. 28, 2009) (mem. op, not designated for publication) (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 n. 18, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987)). The footnote Judge Womack quotes from also distinguishes the determination of an actual conflict of interest from the determination that actual misconduct occurred as a result of the conflict of interest.

Appellant has failed to show any evidence of actual misconduct on the part of Lykos or the District Attorney's Office in pursuing the death penalty in appellant's case. The trial court did not abuse its discretion by granting the State's motion to quash the subpoenas or by denying appellant's motion to disqualify the District Attorney's Office.

*b) Motion to Dismiss Prosecution*

On February 8, 2012, appellant filed a "Motion to Dismiss Death Penalty Prosecution, to Suspend Prosecution or, Alternatively, For Appointment of a Prosecutor Pro Tempore Due to Criminal Investigation of Harris County District Attorney's Office." The motion referred to a local news story from February 7, 2012. The news story explained that a grand jury had investigated the District Attorney's Office regarding problems with DWI testing vans. The story reported that the

grand jury had found no wrongdoing in that matter. However, the Texas Rangers and Federal Bureau of Investigation (FBI) were scrutinizing the District Attorney's Office's use of county resources to conduct background searches of the individual grand jurors, special prosecutors, and judges involved in the grand jury investigation.

In appellant's motion, he asserted that the criminal investigation into District Attorney Lykos' office would "irrevocably taint" the prosecution of his case, either by affecting the prosecutor's impartiality or by creating an appearance of impropriety, unless the trial court granted relief by: (1) barring the State from pursuing the death penalty; (2) delaying the prosecution until after the completion of the investigation; or (3) disqualifying the District Attorney's Office and appointing an independent prosecutor pro tempore to proceed with the case.

At a hearing on the motion, the prosecutor argued that Lykos was not directly involved in appellant's case, and there was no need to recuse the rest of the District Attorney's Office. The prosecutor stated that general counsel in the District Attorney's Office had confirmed that the subject of the pending investigation had nothing to do with appellant's case or with capital murder cases in general. The prosecutor argued that appellant alleged only a general appearance of impropriety but failed to show a due process violation or any particular constitutional violation in his own case.

The trial court denied the motion. It found that appellant had not identified any actual prejudice, there was no evidence of any suspected wrongdoing by Lykos in appellant's case, and there was no showing that Lykos and her office were disqualified.

At a later pretrial hearing, defense counsel re-urged this motion. Counsel stated that a newly published newspaper article indicated that the Texas Rangers had requested the appointment of a special prosecutor in the investigation. Defense counsel submitted the news article for the purpose of the hearing. The prosecutor responded that nothing had changed since the trial court previously denied the motion; appellant still failed to show any connection between the investigation and this case. The trial court again denied the motion.

The record does not show that any alleged wrongdoing for which the District Attorney's Office was being investigated was related to appellant's case. See Art. 2.08(b). Appellant also failed to show that it constituted a due process violation for the District Attorney's Office to seek the death penalty in his case. See Hankins v. State, 132 S.W.3d 380, 387 (Tex. Crim. App. 2004). The trial court properly overruled appellant's motion.

c) Police Presence

Appellant failed to preserve his complaint about the police presence during trial. Defense counsel's closing argument established that he was aware of the police presence in the courtroom. Nevertheless, counsel did not object to the police presence, and he obtained no ruling from the trial court. See Tex. R. App. P. 33.1(a); Yazdchi v. State, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) (stating that, for a party to preserve a complaint for appellate review, he must make a specific objection and obtain a ruling at the earliest possible opportunity). Rather, defense counsel raised the issue for the first time in a motion for new trial. See Yazdchi, 428 S.W.3d at 845 (finding that an argument made for the first time in a motion for new trial was not timely presented to the trial

court and therefore appellant failed to preserve the issue for consideration on appeal); *Burt v. State*, 396 S.W.3d 574, 577 & n. 4 (Tex. Crim. App. 2013) (noting that an appellant may raise a sentencing issue in a motion for new trial for the first time only if he did not have the opportunity to object in the punishment hearing).

Additionally, appellant refers us only to the record of the hearing on his motion for new trial to substantiate his complaints about the police presence during the trial. He does not direct us to any part of the trial record. *Cf. Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) (reh'g granted, reversed on other grounds) (declining to go outside the record and find that police presence in the courtroom was *per se* prejudicial when the record merely reflected that defense counsel had objected the police presence but failed to state how that presence was inherently prejudicial); *see also Sterling v. State*, 830 S.W.2d 114, 118 (Tex. Crim. App. 1992) finding that appellant did not point to any disturbance or other prejudicial circumstance in the record caused by the presence of armed guards in the courtroom, and refusing to "assume the existence of any circumstance or fact" which would indicate "actual prejudice or lack of due process". Therefore, appellant's claim of prejudicial police presence is also inadequately briefed. *See* Tex. R. App. P. 38.1(i); *Busby v. State*, 253 S.W.3d 661, 673 (Tex. Crim. App. 2008). Under these circumstances, we need not reach the merits of this point on appeal.

*d) Cumulative Harm*

Appellant argues that the combined effect of the pretrial publicity, the trial court's rulings, and the police presence deprived him of "the chance for a fair and un-poisoned venire panel" and a fair trial. However, appellant has failed to prove error concerning each of these claims separately, and so we find no cumulative harm. *See Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000) (declining to find harm in "cumulative effect" of alleged constitutional violations after finding no constitutional violations). Points of error four through six are overruled.

## INTRODUCTION OF MATTERS OUTSIDE THE RECORD

In points of error ten and eleven, appellant complains that prosecutor, Lance Long, interjected impermissible evidence and argument into the trial proceedings. To support his points of error appellant alleges that the State attempted: 1) to "poison [the] jury's deliberations by introducing such slippery slope evidence as another prisoner's comparative death sentence;" 2) to mislead the jury with incorrect information regarding the misconduct of another death row inmate, which the defense was not allowed to correct by introducing evidence to the contrary; and 3) to engage in impermissible jury argument. Appellant's claims are inadequately briefed because appellant has not provided specific record references to the relevant argument, evidence, and rulings from the trial proceedings. *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2010) ("We decide that this point of error is inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her."). He relies solely on the record of the hearing on his motion for new trial. However, in the interest of justice, we will review appellant's claim. *But see Ladd v. State*, 3 S.W.3d 547, 575 (Tex. Crim. App. 1999) ("[R]equiring appellants, even capital appellants, to abide by our published briefing rules and to make reasonable arguments in their own behalf does not offend traditional notions of fair play and substantial justice.").

*Error in not admitting defense evidence to correct misinformation from the State*

During the hearing on appellant's motion for new trial, appellant's trial counsel explained on direct examination that a key part of the defense trial strategy was to rebut the State's claim that appellant was a future danger and to advocate that appellant should be given a life sentence instead of the death penalty. At trial, defense counsel compared appellant to another death row inmate, Brian Davis, who had entered death row at approximately the same time as appellant. Counsel asserted throughout the trial that, unlike Davis, who had multiple incidents of violence while on death row, appellant had not had a single reported incident of misconduct during the 22 years he had spent on death row. Counsel urged the jury to consider appellant's good behavior for over two decades on death row as evidence that appellant would not be a future danger.

As evidence of appellant's good behavior while on death row, defense counsel called former TDCJ Officer Bobby Joe Blanton to testify that he had worked in proximity to appellant and Brian Davis for several years at the Polunsky Unit. Blanton affirmed that people on death row could be dangerous. Blanton testified that he was in daily contact with appellant, and appellant was always respectful and quiet. By contrast, Davis committed bad acts, including throwing feces on guards, threatening guards, and possessing contraband. Trial counsel testified at the hearing on the

motion for new trial that the prosecutor interjected information outside the record when he was questioning Blanton.

From the record we can see that during cross-examination the prosecutor asked Blanton whether he could confirm that Davis had assaulted a correctional officer more than one time, and Blanton testified that he knew for sure of only one incident. Appellant's trial counsel wanted to offer into evidence the State's Rule 404(b) notices from Davis' case, in order to prove that Davis had more than one incidence of violence while on death row.[8] The prosecutor objected that these documents were merely notices of the State's intent to present evidence and prove up offenses in a different trial, and therefore they were hearsay. Defense counsel responded that the notices were necessary to rebut the false impressions created by the prosecutor during opening statement and during cross-examination that: (1) appellant had a clean disciplinary record only because it was impossible to get into trouble on death row; and (2) Davis had committed only one assault and had "only been written up one time," when in fact Davis had been written up sixty-six times for disciplinary offenses.[9]

The trial court sustained the State's hearsay objection to the Rule 404(b) notices. The court also noted that, under Rule 403, even if the notices were relevant, their probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay.

8. Unless otherwise indicated, all references to "Rules" refer to the Texas Rules of Evidence. Rule 404(b) provides that evidence of other crimes, wrongs or acts is not admissible to prove a person's character but may be admissible for other purposes, "provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-

in-chief such evidence other than that arising in the same transaction."

9. At the hearing on the motion for new trial, defense counsel testified that the Rule 404(b) notices revealed that Davis had forty-four disciplinary violations. The exact number of violations does not affect our analysis.

The court further noted that the proffered notices were cumulative of other evidence. Defense counsel was allowed to make a bill of exception but the notices were not admitted as evidence to the jury. Appellant claims that not admitting the notices was error and prevented the defense from refuting the false impression the prosecutor created by asking Blanton to confirm that he had knowledge of only one assault committed by Davis while on death row.

Trial counsel in the motion for new trial hearing claimed that the State led the jury to believe that it was not possible for death row inmates to commit misconduct because they were in isolation, and that the isolation, and not appellant's changed character, were responsible for his lack of reported misconduct. At trial defense counsel, in a bill of exception, questioned the prosecutor about his personal knowledge as a prosecutor on Davis' case of Davis' misconduct while on death row. The prosecutor maintained that he was aware of only one incidence of assault. At that time trial counsel entered the 404(b) notices from Davis' punishment retrial into the record. Trial counsel also requested that the defense be allowed to reopen its case and bring the prosecutor to the stand in front of the jury. This request was denied, at which point the defense requested a mistrial. The request for mistrial was also denied and the trial court next proceeded to the charge conference.

Appellant opened the door on a comparison between himself and death row inmate, Brian Davis, and now he complains that the comparison did not pan out as expected. To remedy the problem, appellant asks this Court to find that the trial court abused its discretion in prohibiting him from introducing inadmissible evidence of misdeeds committed by Brian Davis. The trial court did not abuse its discretion by determining that appellant

was not entitled to present the State's Rule 404(b) notices from Davis' case to rebut a false impression. Pleadings from other cases are inadmissible as hearsay. *See Sharpe v. State,* 648 S.W.2d 705, 706 (Tex. Crim. App. 1983) (citing to *Oliver v. State,* 551 S.W.2d 346 (Tex. Crim. App. 1977)) ("This Court has consistently held that the pleadings and judgments from other cases are inadmissible as hearsay."). Further, the trial court was well within its discretion to exclude the proffered evidence under Rule 403 because it was cumulative of Blanton's testimony. TEX. R. EVID. 403.

### Error in allowing the State to make improper jury argument

Appellant asserts in his brief that the State improperly argued in closing argument that appellant had no opportunity to commit bad acts. However, appellant invited the State to make this argument by urging the jury during opening statements and testimony of defense witnesses to believe that appellant, unlike other death row inmates, had not committed any misconduct for 22 years and would not be a future danger. The State did argue in closing argument that death row was a high security facility in which offenders were housed individually and had little opportunity to get into trouble (although the prosecutor conceded that it was not impossible). The State even compared appellant to a vicious dog that had been muzzled and chained and asked the jury to consider whether that dog would be considered a future danger if he told you it had not bitten anyone since it had been restrained. The State also argued in closing that appellant had a long history of committing violent crimes and played a video of an interview appellant gave to the media in which he expressed no remorse for his crimes and even a willingness to do the same thing again. Appellant did not ob-

ject during any of this argument by the State.

During closing argument, defense counsel reminded jurors that Brian Davis had committed numerous disciplinary offenses while on death row, including threatening and assaulting guards, but appellant had served the last twenty-two years on death row without incident.[10] Defense counsel recalled for the jury the testimony of former corrections officer, S.O. Woods, Jr., who described the lack of misconduct by appellant and the relatively minimal security of the Ellis Unit death row where appellant spent the first 9 years awaiting execution of his current sentence. Counsel also recalled the testimony of Polunsky Unit corrections officers, Bobby Blanton and Wilford Griffin, who testified to the misconduct of Brian Davis and the lack of problems with appellant. Counsel urged the jury to find that appellant's good behavior while in prison was a sufficient mitigating circumstance that merited a life sentence.

The jury was free to consider assertions by both the State and the defense regarding future dangerousness and to decide which evidence it found more credible. However, what appellant ignores is that the State presented overwhelming evidence of appellant's prior 13 criminal convictions, including stabbing a sheriff's deputy in the chest with a piece of glass when he was 21 years old and a sexual assault of a 15 year-old girl when he was 46 years old. Although the State in its closing argument did rebut appellant's claim that his past 22 years of peaceful conduct on death row was evidence that appellant would not be a future danger, the majority of the State's closing argument regarding future dangerousness focused on the litany of past assaultive crimes committed by appellant. The mere facts of the crime for which appellant was being re-sentenced in this trial may have been enough to convince the jury of appellant's future dangerousness and no number of years on death row without misconduct may have been enough to persuade the jury that he might not pose some future danger. We will not review the weight a jury may have given to mitigation evidence. We defer to the jury's finding that the mitigation evidence presented by the defense was not sufficient to tip the scales against the evidence presented by the State of appellant's future dangerousness. *Young v. State*, 283 S.W.3d 854, 865 (Tex. Crim. App. 2009) ("While intoxication at the time of the offense and good behavior in prison are factors that a jury might consider, neither precludes a finding of future dangerousness.").

Appellant claims that the State misled the jury with incorrect information regarding the misconduct of another death row inmate, which the defense was not allowed to correct by introducing evidence to the contrary. However, appellant presents no evidence that Brian Davis committed more than one assault while on death row, or that the State's characterization of death row and the restraints under which death row inmates are housed is false. The trial court did not abuse its discretion in refusing to admit 404(b) notices of bad acts from another offender's trial. The notices constituted hearsay and did not meet any of the hearsay exceptions. Appellant also fails to show how the State engaged in impermissible jury argument. The defense presented its mitigation evidence of good behavior while on death row and the State was permitted to rebut that claim

10. Appellant claims that the prosecutor introduced matters outside the record during closing argument. Contrary to appellant's assertions, the prosecutor did not discuss Davis's disciplinary history during closing argument.

with its own questioning of defense witnesses and jury argument based on that testimony. Appellant has not shown that the State interjected information outside the record. Points of error ten and eleven are overruled.

## VOIR DIRE—DENIED CHALLENGES FOR CAUSE

In points of error seven through nine and twelve through twenty-four, appellant complains that during voir dire, the trial court erroneously denied appellant's challenges for cause and requests for additional peremptory challenges to eleven prospective jurors, and that he was thereby forced to accept an objectionable juror.

 If a trial judge errs in overruling a challenge for cause against a venire member, then the appellant must show that he was harmed because he was forced to use a peremptory strike to remove the venire person and that he suffered a detriment from the loss of that peremptory strike. *Chambers v. State*, 866 S.W.2d 9, 22 (Tex. Crim. App. 1993) (citing to *Demouchette v. State*, 731 S.W.2d 75, 83 (Tex. Crim. App. 1986)). Error is preserved for review by this Court only if appellant (1) used all of his peremptory strikes, (2) asked for and was refused additional peremptory strikes, and (3) was then forced to take an identified objectionable juror whom appellant would not otherwise have accepted had the trial court granted his challenge for cause (or granted him additional peremptory strikes so that he might strike the juror). *Id.* at 23. To establish harm for an erroneous denial of a challenge for cause, the defendant must show on the record that he used a peremptory strike to remove the venireperson and thereafter suffered a detriment from the loss of the strike. *Id.* at 22 (citing to *Demouchette*, 731 S.W.2d at 83; *Comeaux v. State*, 445 S.W.3d 745, 750 (Tex. Crim.

App. 2014)) ("When the trial judge denies a valid challenge for cause, forcing the defendant to use a peremptory strike on a panel member who should have been removed, the defendant is harmed if he would have used that peremptory strike on another objectionable juror.")

 In this case, the record shows that appellant 1) made eleven specific challenges for cause; 2) used peremptory challenges on the complained of venire members; 3) exhausted all of his peremptory strikes; 4) was denied his request for additional strikes after he and was granted two additional strikes; and 5) was forced to accept an objectionable juror (Steven Curry) to sit on the jury. Therefore, appellant has preserved error. *Davis v. State*, 329 S.W.3d 798, 807 (Tex. Crim. App. 2010); *see also Green v. State*, 934 S.W.2d 92, 105 (Tex. Crim. App. 1996).

In *Chambers v. State*, this Court noted that, as in this case, the appellant exhausted his fifteen statutory peremptory challenges, requested and received two additional peremptory challenges, and requested and was denied a third additional peremptory strike. The appellant in *Chambers* identified an objectionable juror that he was forced to accept. We held that, "since appellant was granted two additional peremptory strikes, to demonstrate harm, i.e., reversible error, he must show that challenges for cause on at least three venirepersons were erroneously denied." 866 S.W.2d at 23. In this case, because the trial court granted two additional strikes, appellant must show that the trial court erred in denying his challenges for cause to three challenged jurors in order to show harm. *Chambers*, 866 S.W.2d at 23.

 A prospective juror is challengeable for cause if he or she has a bias or prejudice against the defendant or

against the law upon which either the State or the defense is entitled to rely. TEX. CRIM. PROC. art. 35.16(a)(9) & (c)(2); *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). The test is whether the prospective juror's bias or prejudice would substantially impair his ability to carry out his duties in accordance with his instructions and his oath. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Gardner*, 306 S.W.3d at 295. This standard does not require that a juror's bias be proved with "unmistakable clarity" because many venire members simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear." *Witt*, 469 U.S. at 424–25, 105 S.Ct. 844.

Where a party wishes to exclude a juror because of bias, it is the party seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality. *Witt*, 469 U.S. at 423, 105 S.Ct. 844. To establish that a challenge for cause is proper, the proponent of the challenge must show that the prospective juror understood the requirements of the law and could not overcome his prejudice well enough to follow the law. *Davis*, 329 S.W.3d at 807. Before a prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow that law, regardless of his personal views. *Feldman v. State*, 71 S.W.3d 738, 744 (Tex.Crim.App.2002).

The standard of review on appeal is whether the trial court abused its discretion when it overruled a challenge for cause. *Davis*, 329 S.W.3d at 807; *see also Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009). In making this decision, we examine the voir dire of the prospective juror as a whole and determine whether the record shows that the prospective juror's convictions would inter-

fere with his ability to serve as a juror and to abide by the oath. *Davis*, 329 S.W.3d at 807; *Curry v. State*, 910 S.W.2d 490, 493 (Tex. Crim. App. 1995); *see also Feldman*, 71 S.W.3d at 744. We afford great deference to the trial court's decision because the trial judge is present to observe the demeanor of prospective jurors and to listen to tones of voice. *Davis*, 329 S.W.3d at 807. Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory. *Smith*, 297 S.W.3d at 268.

Appellant challenged eleven venirepersons for cause: (1) Steven Curry (points of error seven, eight, and nine); (2) Bryandra Washington (points of error twelve and thirteen); (3) Joseph Martin (points of error fourteen and fifteen); (4) Laura Monigold Robinson (points of error sixteen and seventeen); (5) Erin Aeschbacher (point of error nineteen); (6) Livia Fielder (point of error twenty); (7) Leanne Dundon (point of error twenty-two); (8) Randy Hamilton (point of error twenty-three); (9) Sandra Silvas (point of error twenty-four); (10) Derrick Bradford (point of error eighteen); and (11) Beverly Lewis (point of error twenty-one). Therefore, if appellant's challenges for cause on at least three of these eleven venirepersons had been valid challenges for cause, such that the court erred by not granting them, then appellant would have showed harm. However, as shown below, the court did not err in denying appellant's challenges for cause on three of the eleven challenged venirepersons. The court did not err in denying appellant's challenges for cause on the following nine venirepersons.

### (1) Steven Curry

In points of error seven through nine, appellant asserts that the trial court erroneously denied his challenge for cause and his request for an additional peremp-

tory strike against venire member Steven Curry, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.[11]

Appellant asserts that Curry, who became the jury foreman, was biased against appellant or against some part of the law upon which appellant was entitled to rely. Therefore, he asserts, the trial court's denial of appellant's challenge for cause violated Article 35.16. Specifically, appellant complains that Curry was not qualified because he strongly favored the death penalty, had a brother who was a police officer, and was unable or unwilling to consider any mitigating circumstance other than remorse.

Contrary to appellant's assertions, the trial record does not demonstrate that Curry was clearly biased. When the prosecutor questioned him, Curry stated that he had not decided how to answer the special issues because he had not heard the details of the case. The prosecutor noted that on Curry's juror questionnaire, Curry had written that remorse was a potentially mitigating circumstance. The prosecutor provided other examples of potentially mitigating circumstances, and Curry stated that he was neutral and open to hearing all of the evidence before answering the mitigation special issue.

Curry also testified that the fact that his brother was a police officer would not affect his ability to serve on the jury. *Saldano v. State*, 232 S.W.3d 77, 93–94 (Tex. Crim. App. 2007) (concluding that the trial court properly denied a challenge for cause to a prospective juror whose father was a police officer, when the juror stated that

this fact would not prevent him from following the law as it had been explained to him on voir dire). When defense counsel asked Curry about his questionnaire response that keeping capital murderers in prison was a waste of taxpayers' money, Curry clarified that he felt that if a person was not capable of changing his or her ways, then keeping that person in prison was a waste of taxpayers' money. Curry affirmed that, even in a situation where a defendant had been convicted of killing a policeman, he could find circumstances in the defendant's background, character, or moral culpability that would lead him to impose a life sentence. Defense counsel then asked Curry whether, in light of what he had learned during voir dire, Curry would want to change any of his answers on his jury questionnaire. Curry responded, "No, sir. What—and how I filled on [sic] there, that's how I felt."

Defense counsel challenged Curry for cause, asserting that Curry's statement that his jury service would not be affected by the fact that his brother was a police officer showed that Curry wanted to sit on the jury and was biased for the State because the case involved killing a police officer. Counsel also asserted that remorse was the only mitigating circumstance that Curry was willing to consider.

The trial court responded, "Based on the . . . tenor and demeanor of the . . . potential juror's answers to questions posed and based on this total voir dire examination by both sides, defense challenge for cause is denied at this time." Defense counsel then requested an additional peremptory strike to use against Curry. The trial

11. Appellant also argues generally in various voir dire points of error that the language and history of Article I, Sections 10, 13, 15, and 19 of the Texas Constitution demonstrate that these sections provide greater protection for defendants than does the federal constitution, to "ensure that no man should suffer a death sentence when the jury is so plainly stacked against him." However, he does not specify how these sections should be construed. We therefore decline to reach this issue in any of the points in which it is raised.

court denied the request, and Curry was seated on the jury.

Curry did not indicate, after the law had been explained to him, that he would be unable to set aside his views and follow the law if it conflicted with how he "felt." Rather, Curry's responses during voir dire indicated that he could set aside any biases he might have and listen to all of the evidence. Appellant has not carried his burden of showing that Curry could not be impartial. We defer to the decision of the trial judge, who observed Curry's demeanor and listened to the tone of Curry's voice, and who therefore was in the best position to ascertain whether Curry's opinions would interfere with his ability to serve as a juror. *Davis*, 329 S.W.3d at 807. Points of error seven through nine are overruled.

### (2) *Bryandra Washington*

 In points of error twelve and thirteen, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory challenge regarding venire person Breyandra Washington violated the Fifth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844.[12] Appellant asserts that Washington's responses on her jury questionnaire and during voir dire demonstrated that she was biased in favor of the death penalty and that she would require appellant to present evidence before she could answer the special issues in his favor.

The trial record shows that, when the State questioned Washington during voir dire, Washington stated that she believed in the death penalty in some but not all cases, and she would wait and hear "what

the case was" before deciding whether the death penalty would be an appropriate sentence. She stated that her decision would depend upon the facts and circumstances of the particular case. Washington testified that she could return either a life sentence or the death penalty, depending upon the evidence. Washington had written an answer on her jury questionnaire indicating that she would want to hear from the defendant. However, once the law was explained to her during voir dire, Washington stated that she could follow an instruction not to hold the defendant's failure to testify against him or to consider it as any evidence at all.

Defense counsel challenged Washington for cause on the basis that she would hold a defendant's failure to present evidence against him. The prosecutor responded, "I don't believe she's said she couldn't follow any point of law.... A lot of people can say, look, if I don't have anything from you and only hear from the State, it may be more likely I'd answer those questions in a [certain] way." The trial court denied the challenge, and defense counsel exercised a peremptory strike. Counsel then made a record of his objections and cited to *Witt*, apparently adding bias in favor of the death penalty as a basis for his challenge to Washington. Defense counsel requested an additional strike, which was denied.

The proponent of a challenge for cause must establish that the challenge is proper. *Davis*, 329 S.W.3d at 807. The proponent does not meet this burden until he shows that the law was explained to the potential juror and the potential juror understood the law but could not overcome

12. *See supra* note 14 for explanation of why this Court will not be addressing Appellant's

Texas Constitution arguments.

her prejudice well enough to follow the law's requirements. *Id.*

When questioned by the State, Washington stated that she understood the law and would follow it if she served on the jury. Many of defense counsel's questions simply asked Washington for her personal opinions as she had expressed them on her written questionnaire. In one instance, the record suggests that Washington may have become confused and changed her response after defense counsel second-guessed her first answer. Defense counsel's other questions, particularly those that began with, "A lot of people," and ended with, "Is that a fair statement?" did not directly ask Washington for her personal opinions on the matters in question, much less whether she could set aside her personal opinions. Construed literally, those questions asked Washington whether she thought that counsel's statements about "a lot of people" were fair.

Counsel's questioning did not establish that Washington was unable to set aside her personal opinions well enough to follow the law's requirements and the trial court's instructions. To the extent that Washington's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Davis,* 329 S.W.3d at 807. Points of error twelve and thirteen are overruled.

### (3) Joseph Martin

In points of error fourteen and fifteen, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory strike with respect to venire person Joseph Martin violated the Fifth and Fourteenth Amendments to the Unit-ed States Constitution under *Witt,* 469 U.S. at 424, 105 S.Ct. 844.[13] Specifically, appellant asserts that during voir dire, Martin stated unequivocally that he favored the death penalty, he would vote for the death penalty if the law allowed him to do so, and a person who would kill a police officer would kill anyone. Appellant also complains that Martin would require a defendant to present evidence of his innocence. Appellant asserts that Martin "made it quite clear" that he would sentence appellant to death for the killing of a police officer and that no mitigating evidence would sway him.

The record of Martin's voir dire reflects that Martin strongly favored the death penalty. For example, Martin affirmed that, in response to a question on the written questionnaire that asked Martin to rate his support for the death penalty on a scale of one to seven, where one represented the least support and seven represented the strongest support, Martin circled seven. Similarly, Martin indicated in his questionnaire that he would usually vote for the death penalty in a case where the law allowed him to do so. During voir dire, Martin acknowledged that he was "absolutely for" the death penalty.

However, Martin also indicated during voir dire that, if he were selected as a juror in this case, he could be open to either the death penalty or a life sentence, depending on the evidence. Martin stated that he would follow the law and require the State to prove, beyond a reasonable doubt, that the special issues set forth in Article 37.0711, Section 3(b) should be answered "yes," before he would answer them affirmatively.[14] Understanding that

---

13. *See supra* note 14 for explanation of why this Court will not be addressing Appellant's Texas Constitution arguments.

14. Section 3 of Article 37.0711, which sets forth the procedure in capital cases for offenses committed before September 1, 1991,

appellant had already been convicted of intentionally killing a police officer with no legal justification, Martin stated that he would not find that this fact, without more, merited an automatic answer to any of the special issues. Further, Martin stated that if he answered the Section 3(b) special issues in the affirmative, he would still be open to finding sufficient mitigating evidence and giving appellant a life sentence.

When defense counsel questioned him, Martin stated that he had answered the written questionnaire truthfully and that he still believed that a person who committed capital murder should receive a death sentence. Defense counsel then asked Martin whether he would always impose the death penalty on a defendant who had been convicted of murdering a police officer in the line of duty:

Q. My client has been found guilty of killing a police officer in the line of duty. No self-defense[,] no insanity, no nothing. No justification for it, okay? Case like that, person gets the death penalty, don't they?

A. Yes.

Q. Every time.

A. No. Because I don't know the evidence.

Defense counsel then asked Martin to answer the question again, assuming that he knew nothing more than the fact that appellant had been convicted:

Q. I'm telling you all you know is what I just told you. Intentionally kills a police officer, intentionally, knowingly kills a police officer while in line of duty, no self-defense, no insanity defense, no nothing. No legal justification for it, all right? I think I understand what you're saying.

A. Then my answer to that would be "yes."

Q. Okay.

A. Yes.

Counsel continued asking Martin for his personal opinion, assuming that Martin knew only the fact that appellant had been convicted of the capital murder of a police officer, but Martin again indicated that he would need more information:

Q. All right. The—yeah, it wouldn't—this—these [sic] stuff about whether he did it deliberately or whether he's a continuing threat, none of that stuff would matter to you, would it?

A. Yes, it does.

Defense counsel then moved on to another questionnaire response:

Q. All right. One of your questions you answered is, if someone commits

provides that jurors shall be charged on four special issues:

(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

* * *

(e) The court shall instruct the jury that if the jury returns an affirmative finding on each issue submitted under Subsection (b) of this section, it shall answer the following issue:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

capital murder, they'll do it again. Didn't you tell us that?

A. Yes.

Q. Okay. So when you say someone— if the answer to that question is going to be "yes," if they intentionally and knowingly killed a cop, they're always going to be a continuing threat to society, aren't they?

A. According to my answer, yes.

Q. Okay.

A. Yes.

Q. And it doesn't matter whether their parents were mean to them, or they were dope heads as children, or any of that kind of stuff, would it? Or what their background was or any of that. None of that would matter for that, would it?

A. My belief would be that you've learned from your mistakes and you've learned from your past.

Q. Okay. So, is it fair to say in that kind of case, cop killing case, and intentionally, knowingly, no just—no legal justification, that's—that's always going to be a death penalty case for you, correct?

A. Yes.

Q. That's always going to be somebody who's a continuing threat to society, correct?

A. Yes.

Q. And that somebody—it doesn't matter what their background or moral culpability or—or character would be. That's not going to save them from the death penalty, is it?

A. No, it's not.

Defense counsel then challenged Martin for cause. The prosecutor observed that defense counsel had merely asked Martin about his opinions and beliefs as expressed in his juror questionnaire, and that Martin had already indicated during voir dire that he could follow the law. The trial court denied the challenge for cause. Defense counsel then exercised a peremptory strike and requested an additional strike, asserting that Martin "couldn't have been more clear" in stating that he would always impose the death penalty on a defendant who killed a police officer. The trial court denied counsel's request for an additional strike.

As the proponent of the challenge for cause, appellant had to show that Martin understood the requirements of the law and could not overcome his prejudice well enough to follow the law. See Davis, 329 S.W.3d at 807. However, during voir dire, Martin stated that he could follow the law, notwithstanding his views in favor of the death penalty. Even when defense counsel attempted to get Martin to answer the special issues under the assumption that he knew nothing more than the fact of the capital murder conviction, Martin stated that he would need to know the evidence. When defense counsel asked Martin about another topic, Martin clarified that he was stating his opinions and beliefs "[a]ccording to [his questionnaire] answer." This record reflects that defense counsel merely asked Martin for his views and opinions; counsel did not explore Martin's ability to set aside his personal views and follow the law.

The trial court did not abuse its discretion by determining that defense counsel failed to establish that Martin was not able to set aside his personal opinions well enough to follow the law's requirements and the trial court's instructions. To the extent that Martin's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. Davis, 329 S.W.3d at 807. See Smith, 297 S.W.3d at 268. Points of error fourteen and fifteen are overruled.

### (4) Laura Monigold Robinson

 In points of error sixteen and seventeen, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory challenge concerning venire person, Lora Monigold Robinson, violated the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844.[15] Appellant asserts that the trial court should have granted his challenge for cause against Robinson because she: (1) stated on her juror questionnaire that anyone who would kill a police officer should suffer the same fate as the victim; (2) had a good friend whose daughter was a police officer; (3) strongly favored the death penalty; and (4) would require the defendant to present evidence before she could answer the special issues in his favor.

The trial record shows that Robinson indicated on her written questionnaire that she favored the death penalty, but she also indicated that if she were on the jury, her decision on whether to assess the death penalty would depend upon the facts and circumstances of the particular case. During voir dire, when defense counsel asked Robinson about a questionnaire response that suggested that she was strongly in favor of the death penalty, Robinson stated that, in hindsight, she would probably give a more "middle of the road" answer. She stated that she believed that some cases deserved the death penalty, but she was not in favor of the death penalty "in every situation."

Robinson stated in her written questionnaire responses that the death penalty would be appropriate for a defendant who had been found guilty of capital murder for the intentional killing of a police officer, but she also acknowledged that factors such as mental illness should be considered in deciding the sentence. When the prosecutor questioned Robinson during voir dire about these written responses, she indicated that she understood the special issues and that she would be open to answering them either affirmatively or negatively, depending on the evidence.

On her written questionnaire, Robinson indicated that a defendant in a criminal case should be required to present some evidence to prove his innocence. However, when the prosecutor questioned her during voir dire, she clarified that she did not mean that a defendant should be forced to testify or give evidence, only that she had assumed that the defendant would have a defense. Robinson stated that she understood that she could not draw any inferences or assumptions from a defendant's failure to testify or present evidence. She understood that the State had the burden to prove a defendant's guilt beyond a reasonable doubt.

Robinson also indicated on her questionnaire that she knew some police officers. She wrote that a person who would deliberately kill a police officer deserved the same fate as the victim. However, when the prosecutor questioned her about these responses during voir dire, Robinson stated that she understood the law and that she would not make up her mind about how to answer the special issues until after she heard all of the evidence. She reaffirmed that she could return either a death sentence or a life sentence, depending on the evidence. When questioned by defense counsel, Robinson stated that the fact that her friend's daughter was a police

---

**15.** See *supra* note 14 for explanation of why this Court will not be addressing Appellant's Texas Constitution arguments.

officer would not weigh on her mind or affect her decision "at all" if she served on the jury. *Saldano*, 232 S.W.3d at 93–94. Defense counsel asked Robinson several questions about the matter and Robinson repeatedly affirmed that her answers to the special issues would not be affected by the fact that the victim was a police officer.

Defense counsel challenged Robinson for cause, arguing that her representations that she could follow the law were contrary to her real views and feelings. The prosecutor responded that Robinson had repeatedly stated that she would follow every law that had been explained to her and that she would follow the trial court's instructions. The trial court denied the challenge for cause. Defense counsel then exercised a peremptory strike and requested an additional strike, which was denied.

As the proponent of the challenge for cause, appellant had to show that Robinson understood the requirements of the law and could not overcome her prejudice well enough to follow the law. *Davis*, 329 S.W.3d at 807. Robinson stated that she could follow the law as it had been explained to her, and she moderated one of her questionnaire responses that indicated she was strongly in favor of the death penalty. *Cf. Gonzales v. State*, 3 S.W.3d 915, 917 (Tex. Crim. App. 1999); *see also Gonzales v. State*, 353 S.W.3d 826, at 838 (Tex. Crim. App. 2011) (Cochran, J., concurring). The trial court did not abuse its discretion by determining that defense counsel failed to establish that Robinson could not follow the law's requirements and the trial court's instructions. To the extent that Robinson's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Davis*, 329 S.W.3d at 807. Points of error sixteen and seventeen are overruled.

### (5) Erin Aeschbacher

In point of error nineteen, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory strike with respect to venire person, Erin Aeschbacher, violated the Sixth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Appellant complains that, during voir dire, Aeschbacher stated that her aunt had been murdered and her uncle was a police officer. Appellant asserts that Aeschbacher favored the death penalty for anyone who took a life because "he might do it again." Appellant also complains that Aeschbacher stated that she did not want to view crime scene photos, she was biased in favor of the death penalty for a person who killed a police officer, and she would be inclined to believe a police officer over a civilian. Appellant argues that Aeschbacher's representations that she could set aside her own experiences and beliefs and listen to all of the evidence before reaching a decision did not "cure" her evident bias.

The trial record reflects that Aeschbacher indicated on her juror questionnaire that she had an aunt who had been the victim of a violent crime and an uncle who worked in law enforcement. During voir dire, Aeschbacher explained that her aunt had been abducted, raped, and murdered in Nevada when Aeschbacher was three months old. Aeschbacher stated that the assailant had been seventeen years old at the time of the offense and had been sentenced to a term of "three to life." The prosecutor told Aeschbacher that, if her aunt's assailant had been eighteen years old and had committed the offense in Texas, he could have received the death penalty. The prosecutor asked Aeschbacher if

she felt that such a sentence would have been appropriate in her aunt's case.

Aeschbacher responded that it was hard for her to judge because she did not know her aunt's assailant "individually" and had never met him, although she had "been told the story." Her understanding was that the assailant had been a good student with no previous criminal history. She stated that she "would love to give him the benefit of the doubt—or the benefit of the doubt to change," but she did not know whether he had changed. She added, "[I]f he was—if he had a history and stuff and this wasn't the first case, I would definitely say death penalty." Aeschbacher also stated that she had an uncle in Ohio who used to work in law enforcement. She had forgotten his exact title, but she thought he had been a sheriff "for a little bit" before he became a private detective.

When the prosecutor questioned Aeschbacher about a response on her juror questionnaire indicating that she would lean toward the death penalty in a case where someone was convicted of the capital murder of a police officer, Aeschbacher stated that she would lean toward the death penalty if the defendant "had no remorse or anything like that." When questioned by defense counsel, Aeschbacher acknowledged that she had a slight personal bias in favor of the death penalty in a case where someone was convicted of the capital murder of a police officer, but she also stated that she would be open to listening to all of the evidence and that she could set aside her personal views. Aeschbacher stated that if she served as a juror, she could lean toward a life sentence and require the State to prove beyond a reasonable doubt that the special issues set forth in Article 37.0711, section 3(b), should be answered affirmatively.

Aeschbacher expressed concern that a person who committed one murder might do it again and that there was "a chance" that such a person would continue to pose a threat to society. However, Aeschbacher also understood the difference between possibility and probability, and she affirmed that she could hold the State to its burden of proving beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence in the future. She asserted that she would not assume that the defendant was a future danger based solely on the type of offense he had committed. Aeschbacher stated that, in deciding whether the death penalty would be an appropriate sentence, she would want to know about the defendant's past criminal history, his beliefs on human life, his character, and whether he was remorseful.

When the prosecutor asked Aeschbacher about a questionnaire response in which she indicated that she would not want to see photographs related to the offense, Aeschbacher stated that although she did not like the idea of looking at such images, she could do it. Defense counsel emphasized that if Aeschbacher were selected as a juror, she would likely see photographs involving a real human being who had been brutally murdered, which might trigger an emotional response or bias based on Aeschbacher's past experiences. Aeschbacher responded that she was a "strong individual" and "a very fair person," and she would be able to separate her personal experiences and feelings from her duties as a juror.

Aeschbacher indicated on her juror questionnaire that she would tend to believe a police officer over a civilian witness. When questioned about this response, Aeschbacher explained that she had been taught that police officers had "a code" and were "supposed to be honest," but she would not automatically believe a police officer's testimony. She would want to

know more about the officer's character and listen to his testimony before deciding whether he was telling the truth.

As the proponent of the challenge for cause, appellant had to show that Aeschbacher understood the requirements of the law and could not overcome her prejudice well enough to follow the law. *Davis*, 329 S.W.3d at 807. The facts that Aeschbacher's aunt had been murdered and that her uncle as once a sheriff did not merit a challenge for cause. *Cf. Cardenas v. State*, 30 S.W.3d 384, 391–92 (Tex. Crim. App. 2000) (holding that defense counsel did not err in accepting venire person who knew potential witness in the case but who also stated that she could evaluate the evidence fairly and impartially evaluate that witness's testimony); *Butler v. State*, 872 S.W.2d 227, 242–43 (Tex. Crim. App. 1994) (holding that defense counsel reasonably accepted venire person who stated that the perpetrators of a violent crime against a family friend should have received the death penalty, because venire person's other statements showed her to be fair and open-minded and willing to set aside her feelings); *see Saldano*, 232 S.W.3d at 93–94. Further, Aeschbacher's tendency to believe police officers over civilian witnesses did not make her challengeable for cause. *See Feldman*, 71 S.W.3d at 747 (stating that a defendant is entitled to jurors who do not hold extreme or absolute positions regarding witness credibility; that a venire person is more or less skeptical of a certain category of witness does not make her subject to a challenge for cause). During voir dire, Aeschbacher stated that she could follow the law and set aside any personal bias. To the extent that Aeschbacher's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Davis*, 329 S.W.3d at 807. Point of error nineteen is overruled.

### (6) Livia Fielder

■ In point of error twenty, appellant complains that the trial court's erroneous denials of his challenge for cause and his request for an additional peremptory challenge with respect to venire person, Livia Fielder, violated the Sixth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Appellant asserts that Fielder acknowledged that she was somewhat biased because she had worked as a Harris County probation officer for twenty years. Appellant also argues that Fielder stated that she did not want to be on the jury and that she would be distracted during the trial because she was a single mother and would worry about her child. Appellant further complains that Fielder's response to the juror questionnaire indicated that she would require a defendant to present evidence before she would answer the special issues in his favor.

The trial record shows that, on the juror questionnaire, Fielder responded to the question of whether she wanted to be a juror by stating that she might have "a borderline bias due to [her] job and life-style." During voir dire, Fielder explained that she might be distracted by the amount of time and the schedule required to serve as a juror. She worked full-time in a very busy office and had a thirteen-year-old son whom she picked up at 5:00 p.m. every day.

Defense counsel explained to Fielder that her busy schedule might be a basis for excusing her from the jury, and then he thoroughly questioned her about the matter:

> Q. The law says that if you got something going on in your life and it will substantially impair your ability to sit as a juror, you don't have to be a juror. Okay.

A. Yes.

Q. Stuff like being a single parent and having that responsibility. I have that myself. It's a big burden. And when I heard you talking earlier you were saying, yes, I've got responsibilities for my child; correct?

A. Yes.

Q. Now, you heard the Judge say it would be a possibility in this case that it doesn't necessarily have to be the weekend, that if you sat on this jury that we could work past 5:00 [o]'clock. If you sat on this jury when the jurors got— when the case was over with and the jury started to deliberate they must be sequestered. In other words, they must be locked up overnight.

A. Okay.

Q. Some people come in and tell us, you know, I hear you guys, I see what you're talking about, but because of who I am and my responsibilities I'm telling you worrying about that would substantially impair my ability to sit and concentrate on the evidence. Because everyday when that clock starts getting towards 5:00 [o]'clock I'd start freaking out and not listening to it.

Does that describe you?

A. Yes.

Q. So, can you tell us here right now if you were chosen to sit on this jury because of your duties with your teenager and probably maybe your job too, that you don't think you could sit as a juror and concentrate on the evidence because of those circumstances that substantially impair your ability to sit and listen to the evidence and render a true verdict?

Is that an accurate statement?

A. If you're saying always going to be after 5:00? I guess if it got to those situations where I'm always cutting it close for time and duration of time, I

might would be somewhat always thinking of that.

Q. Okay.

Here's the example we all like to give in here. When you say I might—that might [a]ffect me. The example given here is if your husband was going off to Vegas and you said, you're not going to cheat on me; are you? And they say I might not. That's not a definitive answer; is it?

A. No, it's not.

Q. So what we need to have—I hate to hold you to it. And I think I hear what you're saying. It would impair your ability to be a juror?

A. Yes.

Q. That's what you're telling us?

A. Yes.

Defense counsel then challenged Fielder for cause. The trial court noted that Fielder had affirmatively answered the question whether her ability would be impaired, but she had not affirmatively answered a question whether her ability would be substantially impaired, which was the showing required to sustain a challenge for cause. Defense counsel continued his questioning:

MR. SCARDINO: I'll ask her the qualifying question.

Q. (BY MR. SCARDINO) I'm not going to split hairs with you. I'm not trying to trick you or put words in your mouth. Either on this jury or not because—or off this jury if you tell us that it would substantially impair your ability to sit and listen to the evidence and render a true verdict according to the evidence because of your situation disqualifies you as a juror. That's the question I'm asking.

Because of your situation does it substantially impair your ability to sit and

listen to the evidence and render a true verdict, yes or no?

A. No.

Q. You're telling us you could do that?

A. I can listen and I can understand and accept information. But, yes, I would still have—if I'm running behind time and dead lines and dates and duration of time. But I could still listen and understand and make my decision from what I'm presented.

Following this exchange, defense counsel did not renew his challenge to Fielder on the basis that her concerns with her personal life would substantially impair her ability to serve as a juror.

Fielder also indicated on her written questionnaire that as a probation officer who supervises criminal offenders, she might have "some bias at times with this case." When defense counsel questioned her about this statement, Fielder denied having a bias in favor of the State and stated that she would need to hear the information or evidence in this particular case before making a decision. Fielder stated that, depending on the particular situation, she "might have some leaning one way or the other."

Elsewhere in her questionnaire, Fielder agreed with the statement that a defendant should be required to present some evidence to prove his innocence. When defense counsel questioned her about this statement, Fielder acknowledged that she would prefer to hear information and evidence from the defense because she would expect a defendant to want to present information that could prove his innocence. However, she also stated if the judge ordered her not to consider the defendant's failure to testify or present evidence, she would follow that order.

Defense counsel challenged Fielder for cause because she was biased for the State, "specifically in the area of her inability to follow the law as it pertains to a defendant being required to produce some evidence of his innocence." The trial court denied the challenge, and counsel exercised a peremptory strike. Defense counsel's request for an additional peremptory strike was denied.

As the proponent of the challenge for cause, appellant had to show that Fielder understood the requirements of the law and could not overcome her prejudice well enough to follow the law. *Davis*, 329 S.W.3d at 807. During voir dire, Fielder expressed concern about her busy schedule, but she also indicated that her personal responsibilities would not substantially impair her ability to serve as a juror. Fielder also stated that she could follow the law and set aside any personal bias. To the extent that Fielder's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Id.* Point of error twenty is overruled.

### (7) Leanne Dundon

In point of error twenty-two, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory challenge with respect to venire person Leanne Dundon violated the Sixth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Appellant asserts that Dundon was married to a police officer and believed that an offense against a police officer should carry a higher penalty than an offense against a civilian. Appellant further complains that Dundon stated that she wanted to know whether appellant would receive life without parole if he did not receive the death penalty, because anyone who killed a police officer should never be released from prison.

The trial record shows that, roughly thirty years before she was summoned to jury duty in this case, Dundon was married to a police officer for a period of approximately two years. She stated that she had spoken with her ex-husband "maybe five times in the last 30 years." Dundon affirmed that this personal experience would not affect her ability to be fair in the instant case. *Cf. Saldano,* 232 S.W.3d at 93–94. Dundon explained that she circled two on the written question that asked her to rate her support for the death penalty on a scale of one to seven because she believed the death penalty should be available as a punishment option in very bad cases, such as serial killings and cases involving the deaths of young children. She also believed that the death penalty should be available in a case involving the intentional murder of a police officer in the line of duty. Dundon stated that, if she had known that the instant case was such a case, she probably would have circled five on the scale of one to seven. Dundon further stated that she would not make up her mind without hearing all of the evidence.

Dundon explained her view that the death penalty should be available in cases involving the intentional murders of police officers because police officers are "out there every day trying to protect people," and the death penalty operates as a deterrent. Dundon stated that offenses that hurt police officers should carry higher penalties. However, Dundon also stated that she could imagine a scenario in which someone who intentionally killed a police officer in the line of duty should receive a life sentence, particularly if the person could be rehabilitated. She affirmed that she was comfortable with the idea that a person who had been found guilty of intentionally killing a police officer would get a life sentence unless the prosecutors proved that the sentence should be death.

Dundon volunteered that, in deciding whether to assess a sentence of life or death, she would want to know if life in prison meant life without the possibility of parole. The prosecutor explained that as a juror Dundon would receive an instruction not to consider parole, and she affirmed that she could follow such an instruction:

Q. You brought up life, what that means. I expect that the jury in this case will be given an instruction by the Judge, that tells the jurors they're not to consider how The Board of Pardons and Paroles or the Governor will treat this case in the future. And they're not to, you know, consider how long the defendant will be required to serve if given a life sentence.

That's the instruction from the Court that will be given to you. You may wonder, you may wish you knew, but the instruction is you're not to consider it.

A. Oh, okay.

Q. Can you follow that instruction from the Judge?

A. Yes, if that's the instruction, yes.

Q. Okay. And you may want to know what it means, but do you see? The law doesn't want you guessing what it may or may or—because we want you to base your answer on the facts, not some guess some juror made.

A. I'd want to know all the facts down to the littlest details.

Later, defense counsel asked Dundon whether, after answering the special issues set forth in Article 37.0711, section 3(b) in the affirmative, she could still find sufficient mitigating circumstances. Dundon stated that she could, but then she returned to the topic of parole eligibility:

A .... But I would, like I said before, I'd probably want to know if it would be

life [in] prison without parole, but we are not supposed to consider that.

Q. Why would that be important to you?

A. Because somebody—I'm not supposed to say this, but if somebody deliberately killed a police officer and then, you know, ten years later they're walking around on the street. That wouldn't be so great.

Q. Right. Well—

A. But—

Q. Would that be something you would be taking into consideration in answering these questions?

A. I would've, but he told me you're not supposed to, so, no. Not supposed to consider whether he gets parole or not.

Q. Right. Even though you're not supposed to consider it, what happens to people who do believe it's important is, they tend to answer the questions in another way, because that's important to them.

Would that be you?

A. No.

Defense counsel continued to question Dundon about her ability to set aside any concerns she might have about the possibility that appellant would be released to parole if he received a life sentence:

Q. I hate gorillas, big, mean gorillas, but there's one in the courtroom, right?

A. Uh-huh.

Q. Don't pay any attention to that, okay? Really? Right?

A. Uh-huh.

Q. You can say all you want, but I'm getting out of here as quickly as possible. Or a big tiger, don't pay any attention to it. If it's important to you. You see what I mean? Some people say, "It's just—it's important to me what you've just mentioned on your own, which is life without parole. And if it wasn't li[f]e without parole, it's going to mean something to me. And—maybe not whether they get the death penalty, but maybe to some degree how I'd answer the questions." It's like that tiger that influences you.

THE COURT: Is that your question?

Q. (BY MR. KEIRNAN) My question is: Would that have an influence on you, despite the Judge's charge not to, in the way you answer the questions, even if it's just a little bit.

A. Not to consider the parole thing?

Q. Right.

A. No, I wouldn't. If that's what you're not supposed to do.

Q. I hear you. I was just concerned about why you brought it up or why it was important to you.

A. Because you can look at their background and there can be extenuating circumstances, but if he killed a police officer and he's going to get out in, you know, five or ten years, or not five, maybe ten years, and he deliberately did it, that wouldn't be a good thing to do.

Q. Make you want to make sure that he stays in by getting the death penalty?

A. Make sure he didn't get out?

Q. Right. There's a way to do that in the way you answer the questions, right? There's a way to relieve that concern that you have.

A. Yeah, but they said not to do that. You leave it up to The Parole Board, right?

Q. So they say.

A. Okay.

Q. So they say.

MR. LONG: It's not basic, Judge. [sic] It's so your order would be—if she could follow your order.

THE COURT: It's sustained.

THE WITNESS: Yeah, I could.

THE COURT: But anyway, that's what the law says. But anyway ...

Q. (BY MR. KEIRNAN) It's what the law says, but many people say, "I don't care what the law says, for me it's important and I would consider it, and it would have an [e]ffect on the way I answer the questions; if I thought a person might never get out of jail. Period." People tell us that all the time, because it's their honest opinion. Is that your opinion?

A. That I couldn't say that because he might get out of jail?

Q. No. That you'd be—that you'd consider it in answering the questions in such a way that he wouldn't get out of jail, which would be the death penalty?

A. No, I won't consider it.

Defense counsel then challenged Dundon for cause, asserting that she would be worried about whether appellant would get out of prison while she was deciding whether to sentence him to life or death. Counsel also asserted that Dundon was biased based on her "strong feelings about police officers." The prosecutor countered that after Dundon learned that the trial court would instruct her not to consider the possibility of parole, she had consistently stated that she could follow that instruction. The trial court denied the challenge, and defense counsel exercised a peremptory strike against Dundon.

The trial court did not abuse its discretion by denying the challenge for cause. Although Dundon indicated that she would want to know about the possibility of early release, she repeatedly stated that she could set aside that concern in answering the special issues. *See Gonzales*, 353 S.W.3d at 833; *Soria v. State*, 933 S.W.2d 46, 62–63 (Tex. Crim. App. 1996) (on reh'g, affirming conviction and sentence of death) (stating that the trial court did not err in denying challenges for cause to venire members who expressed interest in the possibility of parole but also stated that they could follow trial court's instructions not to consider the possibility of early release in answering the special issues). Further, Dundon's expression of concern for the safety of police officers and her opinion that the death penalty should be available in a case involving the intentional murder of a police officer in the line of duty were not evidence of bias; her opinion was consistent with the law, which classifies the intentional murder of a police officer in the line of duty as a capital offense. *See* Tex. Penal Code § 19.03(a)(1). To the extent that Dundon's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Davis*, 329 S.W.3d at 807. Point of error twenty-two is overruled.

#### (8) Randy Hamilton

In point of error twenty-three, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory challenge regarding venire person Randy Hamilton violated the Fifth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Specifically, appellant asserts that Hamilton stated in his responses to the juror questionnaire that he would be open-minded, but that he had so much respect for police officers that he believed the death penalty was appropriate when someone killed a police officer. Hamilton also stated that he sponsors a special needs softball team where police officers are coaches, and he has friends and business associates who are police officers. Appellant further complains that, in considering the future dangerousness issue,

Hamilton indicated that he would look at a defendant's "capability" to commit criminal acts of violence rather than the "probability" that the defendant would commit such acts. Appellant argues that Hamilton exhibited a general bias against appellant and for the State.

The trial record shows that Hamilton expressed concern on his juror questionnaire that he might be inclined to favor the death penalty in a case involving the intentional killing of a police officer. But when questioned by the prosecutor during voir dire, Hamilton stated that he could keep an open mind and that he would review all of the evidence before making a decision whether appellant should receive a sentence of life or death:

Q. You know, on your questionnaire, you said open-minded a lot. But at one point in time you said—the question was: Do you think that life imprisonment instead of the death penalty could be severe enough punishment for a person who was guilty of capital murder for the intentional killing of a police officer? And you checked "no" and you wrote, "I remain open-minded, but I respect the true officers so much, that I think that intentional harm of one should come with the death penalty." Okay.

And you filled this out before the law was explained to you. And a lot of people come in here with the assumption, like we talked about earlier, what this kind of case must be about. Maybe it is; maybe it isn't. But I need to know from you as you sit there right now, will you not assume anything and are you open to answering these questions in such a way that he gets a life sentence or a death sentence, depending on the facts of this case?

A. I'm definitely open to hearing both sides and making a decision at that point in time.

Q. Because the next question: If [appellant] is guilty of capital murder, without any legal excuse or justification, the defense might present evidence to the jury during sentencing about [appellant's] childhood and background. In your opinion, how relevant is information like that to you when making a decision about punishment for the intentional killing of a police officer?

And you wrote, "I know there are so many circumstances to consider. But somewhere along the way there should have been help. I remain open-minded but dot, dot, dot."

A. Which means my mind is still open to hearing both sides, because I don't know all of the circumstances of the case.

Q. Well, and I think, you know, this question first of all, says childhood and background. That's not the question. The question is the character and background. Maybe childhood's important to you, maybe it's not. Neither side can ask you what would be important to you in deciding this.

What we can ask you is, are you open to searching the evidence for those mitigating circumstance or circumstances? And if you find them sufficient, that you will—I think the legal word is, give them effect and answer that question in such a way that he gets a life sentence?

A. Yes.

The prosecutor noted that Hamilton had indicated elsewhere on his juror questionnaire that he agreed with the statement that a sentence of life is enough punishment for a person convicted of capital murder, but he also agreed with the statement that a sentence of life is not enough punishment for a person convicted of capital murder. Hamilton responded that he "purposely answered it that way" because he wanted the parties and court to under-

stand that he had an open mind about the punishment decision.

Defense counsel asked Hamilton about his contacts with police officers, and whether those contacts would affect his decision if he were selected as a juror in this case:

Q. What—do you know any police officers?

A. Yes, I sure do.

Q. Got police officer friends?

A I do. They come into my business.

Q. Okay. What—are they DPS or are they—

A. Harris County.

Q. Harris County Sheriff's deputies?

A. Sheriffs, yes, sir.

Q. The—friendly with them outside of the business? Ever see them socially or talk to them or actually sit with them?

A. Actually, we—we associate with— I'm sponsoring a special needs softball team and they are coaches for the team. And so, I sponsor the team.

They have our business name on the back. And we go out and participate with the—the kids and help them play softball. That's—that's about it.

Q. Okay. Yeah, I saw where you participated in the special needs things.

If you were on this jury, do you think you'd have a problem with a—because it's—it's a police—killing of a police officer. And I anticipate there will be lots of police officers in and around the case. Think you'd have a problem if it was an unpopular verdict with the police and be with them. Having to go back and tell them—explain to them why that you gave a cop killer a life sentence?

A. I wouldn't have a problem with it, because I'm going to do what I'm instructed to do. I'm going to do what— what I think is right to do when I'm part of a jury. So, I guess, I'm part of a jury. I would try to do the right thing, because I'm not just thinking of the— the police officers' opinions. I'm thinking of the case and whatever thing— thinking of everything that was presented to me and how we should answer the question.

Defense counsel also asked Hamilton about the future dangerousness special issue:

Q. The next [question] talks about the—that same person if—that's been found guilty and now has been found that could—can—found that it was deliberately, the killing deliberately, this question's asking you to look into the future, isn't it?

It says: Do you find beyond a reasonable doubt there is a probability the defendant would commit a criminal acts of violence that would constitute a continuing threat to society?

It's saying to tell us whether it's more likely than not that they're going to commit future acts of violence. That's kind of looking into the future, isn't it?

A. You can look at it that way, but you could also look at it as, they've done it once before and maybe they could consider doing it again. So, yeah, you could look at [it] as looking into the future, but you don't know the future, so . . .

Q. Right. But it's not asking about whether they'd do it again. It's asking you whether there's a probability of continuing acts of violence.

A. Well, I look [at] it as they're capable.

Q. Capable.

A. So you can—I'm substituting probability for—I'm substituting capable for probability.

Q. Okay. So—and a lot of folks come here and tell us this, "If I—if somebody

intentionally killed a police officer and I found that he deliberately killed a police officer, that person to me is going to always have a probability of committing future acts of violence. Because if they can do that, they can do any—they can do any violent acts."

A. Well, but I also believe that people can be reformed also. So it leaves some possibility in there.

Q. Okay. Two of the key words in that—in that question are "probability" and "continuing," all right?

A. Okay.

Q. It says not that there's a possibility they could do it, it says probability. And then the Judge told you that it's not just possible because—you agree with me anything's possible, right?

A. It is.

Q. I mean, earth could start spinning the other way tomorrow morning. That's possible. Unlikely. But probability [is] more likely than not, okay?

A. Okay.

Q. So, that's what this question is asking. Not—is it more likely than not that that person is going to commit acts of violence, that would be a continuing threat. Not just the next day or two weeks or a year but—but continuing. See what I mean?

A. Uh-huh.

Q. So, it's kind of asking you to look into the future, isn't it?

A. Well, for me—

Q. Or predict it with some probability?

A. For me, it's asking me to hear more, because I—I can't tell anyone's future. I'm not a future teller, but, you know, I don't know what their life has been like. I—there's a lot of details I just don't, you know, and so I can't really—

Q. Okay.

A. —decide that for sure.

Q. The—the fact that somebody has murdered a police officer, is that going to create a circumstance in your mind, that you would be afraid that they would commit future acts of violence?

A. I wouldn't be afraid. I'd be concerned.

Q. Okay.

A. You know, if I had a—a decision on what happens with that person, I'd be concerned, yeah.

■ A prospective juror is not subject to a challenge for cause merely because he associates with law enforcement officers. *See, e.g., Saldano*, 232 S.W.3d at 94 (finding no abuse of discretion in denying challenge for cause to prospective juror whose father was a police officer but who stated on voir dire that this fact would not prevent him from being objective and able to follow the law as it had been explained to him). Hamilton stated that his contacts with law enforcement officers would not affect his ability to make a punishment decision. The trial court was in the best position to evaluate Hamilton's demeanor when he made this statement, and we defer to the trial court's decision to credit Hamilton's statement. *See Davis*, 329 S.W.3d at 807.

With respect to Hamilton's understanding of the future dangerousness special issue, defense counsel's questioning did not establish that Hamilton was unable to set aside his personal opinions and follow the law as instructed by the trial court. *See Davis*, 329 S.W.3d at 807; *Murphy v. State*, 112 S.W.3d 592, 600 (Tex. Crim. App. 2003). When questioned about the future dangerousness special issue, Hamilton's initial statement about "capability" might have indicated a misunderstanding. However, after defense counsel explained the distinction between "possibility" and

"probability," Hamilton did not express any further misunderstanding. Although Hamilton was uncomfortable with defense counsel's characterization of the future dangerousness special issue as a question that required him to "look into the future," his responses indicate that his discomfort arose from the fact that he did not yet have any information about the defendant that would help him answer the question. Hamilton's statement that he would be "concerned" that a murderer would commit future acts of violence did not signify that he would be unable to set aside his personal opinions in answering the special issues. To the extent that Hamilton's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. *Davis*, 329 S.W.3d at 807. Point of error twenty-three is overruled.

### (9) Sandra Silvas

In point of error twenty-four, appellant complains that the trial court's erroneous denials of his challenge for cause and request for an additional peremptory challenge concerning venire person Sandra Silvas violated the Sixth and Fourteenth Amendments to the United States Constitution under *Witt*, 469 U.S. at 424, 105 S.Ct. 844. Appellant asserts that Silvas stated that anyone who committed capital murder should pay with his life. She also stated that "deliberate" did not mean anything more than "intentional." Therefore, appellant argues, Silvas was disabled or impaired under *Witt*.

On her written questionnaire, Silvas agreed with a statement that her decision on whether to assess the death penalty would depend upon the facts and circumstances of a particular case. But Silvas also agreed with a statement that any person who commits capital murder should pay with his own life. When the prosecutor asked Silvas about these two questionnaire responses, she stated that, even in a case in which a defendant intentionally killed a police officer, the sentence should depend on the circumstances of the case. She stated that she would not "choose death" in every case in which the victim had been a police officer. Silvas repeatedly affirmed that she would need to know all of the details before she could make a decision.

Defense counsel noted that many of Silvas's questionnaire responses reflected that she strongly favored the death penalty. Silvas agreed with that characterization. Defense counsel asked Silvas about her written response to a question that asked her to describe her beliefs about the penalty of life in prison for a person who was guilty of capital murder for intentionally killing a police officer. Silvas had responded, "Depending on the circumstances, life may be a possibility but, to me, life may not fit the crime." Silvas stated that she still agreed with that statement. But Silvas also stated that she did not know whether life imprisonment or the death penalty would be appropriate in this case because she did not know the evidence.

Defense counsel reviewed many of Silvas's additional questionnaire responses that indicated she favored the death penalty. After reading each response aloud, counsel asked Silvas if she "still agree[d] with that." Silvas confirmed that she did, but she also stated that she had answered those questions when all she knew was that the case involved the capital murder of a police officer. When defense counsel asked Silvas about her questionnaire response stating that life imprisonment was a waste of taxpayer money, Silvas still agreed with that statement. However, Silvas also stated that it was not a consideration that would weigh on her decision in

the instant case. Silvas disagreed with defense counsel's statement that she was "very much closer to the death sentence than ... a life sentence before [she] even hear[d] any of the facts." After the law had been explained to her, Silvas also stated that she would change some of her written questionnaire responses. For example, once the law concerning the State's burden of proof had been explained to her, Silvas stated that she no longer agreed with the statement that the defendant should be required to present evidence to prove his innocence.

The trial record further reflects that the prosecutor explained to Silvas the distinction between "intentional" and "deliberate," and initially Silvas did not express any confusion:

Q. The Judge—I think he explained to you that this issue which is—has to be asking something more than whether or not the defendant did it intentionally because we already—that finding has been made. And the question of: Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

Okay, the word "deliberate." It's not going to be defined for you. But the legislature didn't use premeditated, which means planned out ahead of time. So, it's somewhere in between there, wherever that is, is up for you to decide. You know, most people in your situation aren't around murders all the time, so I—I use the red light example of—or maybe a football example.

\* \* \*

Q. You know, it's like if you watched the Super Bowl, that, you know, maybe there's a defensive player—that there's

a punt fumble and in the instant he sees the fumble and he intentionally jumps to recover the football. Do you see how he didn't plan that out, that particular situation?

A. Right.

Q. Didn't really think about it, but when he saw the football in an instant he formed a desire to intentionally go after that ball, okay?

The same thing could be true of a killing. You and I are together. We're friends. For some reason we get in a very heated exchange, and in the fit of anger that comes over me in an instant, I pick up a knife and stab you and kill you. I form the intent to do it in a fit of anger. I'm sure you can see how a lot of murders happen when someone flies into a rage all of a sudden, right?

A. Right.

Q. Okay. That's intentional. Now, maybe take us back to the football scenario. Maybe that defensive back sees the player across the field catch a pass. And he thinks about it, "I'm going after him." And he turns, he puts his focus and starts running across the field. There is more thought and more effort that went into going after that tackle versus the instantaneous decision to recover the fumble. Do you see the distinction?

A. Yes.

However, as the prosecutor continued, Silvas expressed some confusion:

Q. Okay. I don't know if that's deliberate to you or maybe in the killing rather than stabbing one time, I do it several times and put more work and thought into it. Maybe that's deliberate to you. But my question is: Does this question ask something more to you than simply whether or not he intentionally killed the officer?

A. No.

Q. It does not?

A. No.

Q. So have you made up your mind that you'll answer that question "yes" simply because he's been found guilty of intentionally doing it? Or am I confusing you?

A. You're confusing me.

When the prosecutor clarified the question, Silvas appeared to understand the distinction:

Q. Okay. Or make certain. I was a little taken back. Do you see that this question of asking whether or not the defendant acted deliberately and with a reasonable expectation that the death of the deceased or another would result is asking something more than whether or not he killed the officer intentionally?

A. Oh, okay, yes.

Q. Okay. Because we already know it was intentional.

A. Right.

Q. You know, I like to put it on a scale. Here's intentional, here's deliberate somewhere in here, and up here is premeditated. Deliberate is somewhere in here wherever it is to you. And you may think it's more likely that he did it deliberately because intentional is part of deliberate, but deliberate encompasses something greater than just intentional. Do you see that?

A. Yes.

This record reflects that Silvas generally understood the distinction between "intentional" and "deliberate," although she was momentarily confused by the prosecutor's questioning. Defense counsel did not ask Silvas any questions about this distinction.

The proponent of a challenge for cause must show that even after the applicable law was explained to a prospective juror, the juror was unable to set aside her personal biases and follow the law. See Davis, 329 S.W.3d at 807. In this case, Silvas did not express an inability to set aside her personal opinions and follow the law. When questioned by the prosecutor, Silvas consistently stated that she would need to know all of the evidence before she could answer the special issues, and she did not think that the death penalty was always appropriate for the capital murder of a police officer. Most of defense counsel's questioning merely sought confirmation of Silvas's views as she had expressed them on her juror questionnaire. When defense counsel specifically asked Silvas how those views would affect her as a juror, she repeatedly stated that she would have to hear all of the evidence and that she did not believe that the capital murder of a police officer should automatically be punished with a death sentence. To the extent that Silvas's answers were vacillating, unclear, or contradictory, we afford particular deference to the trial court's decision. Davis, 329 S.W.3d at 807. Point of error twenty-four is overruled.

In sum, to demonstrate reversible error, appellant must show that the trial court erroneously denied his challenges for cause to at least three of the eleven prospective jurors at issue in points of error seven through nine and twelve through twenty-four. See Comeaux v. State, 445 S.W.3d 745, 749–50 (Tex. Crim. App. 2014). Because appellant has failed to established that the trial court erred in denying his challenges for cause to nine of those potential jurors, we need not consider his eighteenth and twenty-first points of error which concern his challenges for cause to venire members Derrick Bradford and Beverly Lewis. See Chambers v. State, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993). Points of error seven through nine and twelve through twenty-four are overruled.

## MOTION TO INCLUDE LIFE WITHOUT PAROLE

█ In point of error twenty-five, appellant asserts that the trial court violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it denied appellant's motion electing to include life without parole as a sentencing option and waiving his right to be tried under Article 37.0711. Appellant states that he requested that the trial court apply the law in effect at the time of his 2011 punishment retrial by including life without parole as a sentencing option. Appellant reasons that, since a defendant may knowingly and voluntarily waive most rights, he should have been allowed to waive "the 'right' to be punished under an antiquated system that is no longer in effect."

Appellant asserts that the denial of this motion harmed him because the District Attorney and the Officer Irby's widow had expressed concerns to the local media that appellant could be released on parole if he received a life sentence. He further asserts that the harm is apparent from Venire Person Dundon's, apparent concern with the availability of parole, which prompted appellant to exercise a peremptory strike against her.[16] Appellant also appears to argue that there is no need to show harm because the trial court's denial of his motion constituted structural error and violated the United States Supreme Court's "ruling" in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), "that sentences in capital cases must be consistent in application." Appellant cites no authority for his position that the trial court erred, or that the error, if any, was structural.

The trial court did not err by refusing to apply a punishment provision that, by its own terms, does not apply to an offense committed in 1990. *See Smith v. State*, 907 S.W.2d 522, 534 (Tex. Crim. App. 1995) (holding the trial court erred by omitting the deliberateness instruction that was required by the law in effect when offense was committed in 1988, although the instruction was not required by the law in effect at the time of the 1992 trial); *see also Powell v. State*, 897 S.W.2d 307, 316–18 (Tex. Crim. App. 1994), *overruled on other grounds by Prystash v. State*, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999). Applying the version of the sentencing scheme that was in effect when the offense was committed did not render appellant's sentence unconstitutional. *See Threadgill v. State*, 146 S.W.3d 654, 672 (Tex. Crim. App. 2004) (holding that the inconsistency of various capital-sentencing schemes is not the type of arbitrariness condemned by *Furman*); *Matchett v. State*, 941 S.W.2d 922, 934 (Tex. Crim. App. 1996) ("Because those committing the same offense on the same day are subject to the same statutory scheme, they are similarly situated and are similarly treated"). Further, we have repeatedly rejected claims that the applicable sentencing scheme is unconstitutional for failing to provide the jury with the sentencing option of life without parole. *See Luna v. State*, 268 S.W.3d 594, 609 (Tex. Crim. App. 2008). Point of error twenty-five is overruled.

## FUTURE DANGEROUSNESS SPECIAL ISSUE

In point of error twenty-six, appellant complains that the future dangerousness special issue is "constitutionally infirm un-

---

16. In the text of his argument, appellant adds a complaint concerning the trial court's denial of his request for an opportunity to explain the parole law to the jury. This argument renders his point of error multifarious, and we will not address it. *See* Tex. R. App. P. 38.1; *Soliz v. State*, 432 S.W.3d 895, 900 (Tex. Crim. App. 2014).

der the Eighth and Fourteenth Amendments." Appellant asserts that the trial court denied his pre-trial motions raising this matter. He argues that capital juries cannot accurately predict a defendant's future dangerousness. Appellant also argues that his jury did not have the benefit of recent research which indicates that the State's predictive evidence is almost always wrong. He complains that the trial court prevented the introduction of evidence that would have informed the jury how prison society actually functions, and how appellant is statistically "almost no threat at all." Appellant asserts that the fact that his life depends upon a jury's "best guess," based upon largely incorrect evidence, violates his right to be free from the risk of an arbitrary death sentence and execution.

Appellant has not provided a citation to the record showing where he presented his claim to the trial court. Therefore his claim is inadequately briefed. *See* Tex. R. App. P. 38.1(i). Further, this Court has rejected similar claims. *See Fuller,* 253 S.W.3d at 233; *Martinez,* 327 S.W.3d at 740.[17] Point of error twenty-six is overruled.

We affirm the judgment of the trial court.

Hervey, J., filed a concurring opinion in which Keasler and Newell, J.J., joined.

Alcala, J., filed a concurring opinion.

HERVEY, J., filed a concurring opinion in which KEASLER and NEWELL, JJ., joined.

I join the majority opinion of this Court, but I write separately to make three ob-

servations regarding Judge Alcala's suggestion urging "the Legislature to consider amending the article [1] to add a provision that would permit the possibility of a life sentence without parole under the circumstances presented by this case." Concurring Op. at 107 (Alcala, J.). Judge Alcala finds the absence of such an instruction for cases occurring under Article 37.0711 of the Texas Code of Criminal Procedure on or after September 1, 1991, to be an inequity that the Legislature may choose to address. This argument ignores the fact that equity includes the right of the State of Texas to decide to seek the death penalty in the first place, and the right of the jurors to make an ultimate decision based on all the facts and their right to perform their duties based on the law provided by the Legislature at the time they carry out that heavy burden.

I believe that such a change in the law might violate the prohibition against ex post facto laws enshrined in the Texas and Federal constitutions, especially in cold cases and in reversals of those cases where the offense occurred before September 1, 1991 or in years between 1991 and 2005, after which Article 37.071 was amended to allow the jury only a choice of life without parole or death. And what roles do former Article 42.18, Section 8 of the Texas Code of Criminal Procedure and current Section 508.145 of the Texas Government Code play in this suggestion to the Legislature? Although Judge Alcala suggests an inmate might prefer consideration of life without parole, I cannot imagine an inmate preferring that choice to a possibility of parole in 15 years or even 40 years, and since life without parole would be a greater punishment, it runs up against ex

---

**17.** To the extent that appellant complains about the trial court's exclusion of evidence, his complaint renders this point of error multifarious, and we will not address it. *See* Tex.

R. App. P. 38.1, *Soliz,* 432 S.W.3d at 900 (Tex. Crim. App. 2014).

**1.** Tex.Code Crim. Proc. art. 37.0711.

post facto law and the fact that one cannot be sentenced to a punishment that did not exist at the time of the offense. Moreover, former Article 42.18, Section 8 and current Section 508.145 of the Texas Government Code would seem to provide an even greater pool of inmates that could be hindered by ex post facto law. And I note that we have held that parties cannot consent to waive the prohibition against ex post facto laws. *Phillips v. State*, 362 S.W.3d 606, 611–12 (Tex.Crim.App.2011), *overruled on other grounds, Ex parte Heilman*, 456 S.W.3d 159 (Tex.Crim.App. 2015). So even if the parties were to agree to reformation, ex post facto law would direct them to the punishment applicable at the time of the offense.

This is true despite our holding in *Ex parte Maxwell*, 424 S.W.3d 66 (Tex.Crim. App.2014), in which the majority of this Court decided that a juvenile could not automatically be sentenced to life without parole and also decided that the provision was retroactive. That case can be distinguished based on the fact that *Maxwell* allowed for consideration of a lesser sentence. Life without parole is not a lesser sentence than life with the possibility of parole in 15 through 40 years.

Second, in Texas a defendant cannot waive a jury in a capital/death case. Tex. Code Crim. Proc. art. 1.13. Thus, reforming those cases in which a jury found death to be the appropriate punishment based on the sheer speculation that juries would be more likely to choose death rather than life with parole totally usurps the role of the jury.

Finally, in addressing inequity, what are we to make of Article 44.2511 of the Texas Code of Criminal Procedure in which the Legislature already allows for reformation of these old cases under certain circumstances? With these additional comments,

questions, and considerations, I respectfully join the opinion of the majority.

Alcala, J., concurring

I join this Court's majority opinion that affirms the sentence of Carl Wayne Buntion, appellant. I agree with the majority opinion's conclusion that the trial court's ruling properly excluded a jury instruction requested by appellant, and thus I agree with this Court's overruling of his twenty-fifth point of error. Although I agree with this Court's and the trial court's view of the law that applies to appellant's case, I also agree with appellant that there appears to be an inequity in the law. I write separately to discuss that inequity.

Appellant challenges the omission of a life-without-parole instruction at the sentencing phase of his trial for capital murder. Because of the date of his offense, the sentencing scheme that applies to appellant is set forth by Code of Criminal Procedure Article 37.0711. *See* Tex.Code Crim. Proc. art. 37.0711. That article provides for the possibility of a life sentence with parole for this offense. *Id.* In contrast, under the current capital-murder sentencing scheme set forth in Code of Criminal Procedure Article 37.071, other defendants whose offenses occurred at a later date have a possibility of a life sentence without parole. *See id.* art. 37.071. Thus, because of the date of appellant's offense, he, unlike other defendants, was ineligible for a sentence of life without parole, and more importantly, he was ineligible for a jury instruction that would inform the jury that a life sentence would preclude his parole.

A brief overview of the punishment scheme for capital murder is helpful to understanding appellant's complaint. Under the punishment scheme currently set forth in the Code of Criminal Procedure, defendants convicted of capital murder are

treated differently with respect to parole eligibility depending on the date that their offenses were committed. *Compare id.* art. 37.071 (providing for punishment at a capital-murder trial for offenses occurring on or after September 1, 1991, to be set either at death or life without parole), *with* art. 37.0711 (providing for punishment at a capital-murder trial for offenses occurring before September 1, 1991, to be set either at death or life imprisonment with the possibility of parole). In short, those defendants convicted at trial of capital-murder offenses occurring before September 1, 1991 are eligible for life imprisonment with the possibility of parole, but defendants convicted of capital-murder offenses occurring on or after September 1, 1991, have no possibility of parole. Furthermore, with respect to the trial court's instructions to the jury, Article 37.071 requires the trial court to inform the jury that a defendant who is not sentenced to death must be sentenced to life without parole, whereas Article 37.0711 has no similar requirement, regarding parole eligibility. *Compare id.* art. 37.071, *with* art. 37.0711.

Here, because appellant's offense occurred in June 1990, at a point in time before the September 1, 1991 cutoff for applicability of Article 37.071, the trial court refused to instruct the jury that appellant could be sentenced to life without parole. Appellant contends that, because the jury was not given the life-without-parole option, its only alternative to a death sentence was a life sentence with the possibility of parole, and he suggests that this made it more likely that the jury would favor answering the special issues so as to result in a death sentence. Although the concurring opinion cannot imagine any defendant desiring to be sentenced to life without parole when he is eligible for a sentence of life with parole, that is precisely what is occurring here.

We need look no further than the instant case before this Court.

I note here that it is debatable whether a defendant who is facing a capital-murder conviction at trial will perceive the possibility of a life sentence with parole eligibility to be something that is of benefit to him. On the one hand, at first blush, parole eligibility under Article 37.0711 seems beneficial to a defendant in that he has the possibility of one day being released from prison. *See id.* art. 37.0711. But eligibility for release does not guarantee actual release, and the heinousness of capital murder makes parole unlikely. On the other hand, a sentence of life without parole closes the door on the chance of parole for the remainder of a defendant's life, but many defendants may anticipate such an outcome anyway, even if they are theoretically eligible for parole under Article 37.0711. *See id.* arts. 37.071, 37.0711. Consequently, a defendant reasonably may believe that, because Article 37.071 requires a trial court to instruct the jury that the only alternative to a death sentence is a life sentence without parole, this instruction may sway a jury's decision in answering the special issues in a way that results in a life sentence rather than a death sentence, and thus the sentencing scheme in Article 37.071 is more beneficial to him than the scheme in Article 37.0711. *See id.* For this reason, a rational defendant who is entitled to the possibility of parole under Article 37.0711 might choose to intentionally and knowingly waive his right to the life-with-parole option under that article so as to proceed at trial under the punishment scheme set forth in Article 37.071, which provides for a minimum sentence of life imprisonment without parole. *Compare id.* art. 37.071, *with* art. 37.0711. The problem is that it does not appear that the Legislature has provided a sentencing scheme that would permit a trial court to instruct the jury in this way, even at a

defendant's request, as here. Thus, even though the Legislature has enacted legislation requiring a trial court to instruct juries that a defendant convicted at a trial for capital murder for offenses occurring on or after September 1, 1991 will be sentenced either to death or to life without parole, no legislation currently permits that identical instruction for offenses occurring before that date, even when a defendant waives his right to seek parole and he is effectively seeking to be sentenced to life without parole. This is an inequity that exists under our current statutory scheme.[1]

This inequity could be addressed through a legislative enactment applicable to a defendant convicted of capital murder for an offense occurring before September 1, 1991, who intentionally, knowingly, and voluntarily waives his right to the possibility of a sentence of life with parole. Under those circumstances, a statute could require the trial court (1) to instruct the jury that the only alternative to a death sentence is a sentence of life imprisonment without parole, and (2) to sentence a defendant to life without parole in the event that the jury's answers to the special issues did not compel a death sentence. Because the Legislature already has determined that society's interest in the punishment of defendants for capital murder is best served by informing the jury about a sentence of life without parole as an alternative to a death sentence, it appears to me that this anomaly in the statutory scheme is likely a product of legislative oversight.

I also note that there are currently 251 people on Texas's death row, with the majority of those offenders—167 people, or about two-thirds of the population—having been there for over ten years. Because many of those individuals were sentenced to death before the life-without-parole option was available as an alternative to a death sentence for those convicted of capital murder, a statutory enactment could also address this situation by permitting the parties, under limited circumstances, to agree to reform a death sentence to life imprisonment without parole in a post-conviction proceeding.

This type of sentence reformation to life without parole may, in some appropriate cases, serve society's best interest by guaranteeing that a defendant will spend the remainder of his natural life in prison. For example, the Governor, through a clemency proceeding, or a state prosecutor in response to a habeas application, might reasonably believe that reforming a sentence from death to life without parole is

1. I observe that members of this Court have, on numerous occasions, highlighted deficiencies in the existing law and suggested ways in which the Legislature might act to remedy them. *See, e.g., In re Allen,* 462 S.W.3d 47, 55 (Tex.Crim.App.2015) (Yeary, J., concurring) (urging the Legislature to provide a workable definition of intellectual disability in the capital-sentencing context and to create an appropriate procedure for litigating that issue); *Green v. State,* 374 S.W.3d 434, 447 (Tex. Crim.App.2012) (Price, J., concurring) (urging the Legislature to amend the competency-to-be-executed statute to clarify proper standard of review on appeal); *Hollen v. State,* 117 S.W.3d 798, 803 (Tex.Crim.App.2003) (Holcomb, J., concurring) (urging the Legislature to revise the felony driving-while-intoxicated statute to eliminate risk of improper verdict based on prejudice introduced by evidence of prior convictions); *Dixon v. State,* 201 S.W.3d 731, 737 (Tex.Crim.App.2006) (Cochran, J., concurring) (suggesting that the Legislature enact new penal statute focused upon criminalizing continuous sexual abuse); *Lefevers v. State,* 20 S.W.3d 707, 712 (Tex.Crim.App. 2000) (Keasler, J., concurring) (urging the Legislature to substantively amend harassment statute); *Tyra v. State,* 897 S.W.2d 796, 802 (Tex.Crim.App.1995) (Maloney, J., concurring) (suggesting that the Legislature should re-examine statute governing deadly-weapon findings to determine whether it had served its intended function).

appropriate under circumstances showing that a defendant is gravely ill, has a serious mental illness or intellectual challenge, has demonstrated that he is no longer a future danger to society based on remorse or some other events, or when there are enough questions about his guilt or the imposition of his death sentence that a life sentence without parole is the just outcome. Similarly, a defendant might reasonably agree to reform a death sentence to life without parole under those same circumstances because his post-conviction legal challenges concern only the imposition of the death penalty rather than his guilt.

I agree with appellant that there is an inequity in permitting a jury instruction about the life-without-parole option only in more recent capital-murder cases, but disallowing such an instruction in older capital-murder cases. I also agree with him that the absence of a life-without-parole instruction might possibly influence a jury's decision in favor of a death sentence. Appellant has identified a significant problem with the law affecting death-sentenced defendants, but I am compelled to conclude that, as this is framed as a jury-charge complaint, the solution lies in the legislative rather than the judicial branch.

My colleague's concurring opinion is symbolic of the uphill climb that capital-murder defendants face in their efforts to have this Court even acknowledge that there is a problem, much less work for a solution that might be beneficial to society. Rather than agreeing that this is a problem that the best and brightest minds in the Legislature may wish to work together towards rectifying, the concurring opinion attempts to obscure a possible solution by making the problem appear unresolvable. I quickly address each of the arguments in the concurring opinion to demonstrate their fallibility.

With respect to the suggestion that considerations of equity should focus on the State's right to make a decision about whether to seek the death penalty and jurors' right to decide death-penalty cases, I note that this argument misunderstands the nature of appellant's complaint. Appellant's challenge is that, having been granted a retrial on punishment for capital murder, it is inequitable for him to be denied a jury instruction that other defendants on trial for that same offense receive as a matter of right under the law. Nothing about appellant's complaint implicates the State's or jurors' rights in any way. As far as post-conviction modifications to life without parole that might occur, obviously the Legislature would define the parameters of that type of modification, but I suspect it would require the agreement of the State and a representation to a trial judge that the modification is in society's best interest.

The suggestion that the prohibition on ex post facto laws is implicated here is similarly misinformed. I agree that the Legislature could not enact a law that required life without parole for all capital-murder defendants whose offense dates place them within the statutory sentencing scheme that permits life with parole for this offense. But that is not what I am proposing, nor is it what actually occurred here. This Court has described an ex post facto violation based on the theory that "'the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it.'" *Ex parte Heilman*, 456 S.W.3d 159, 163 (Tex.Crim.App.2015) (quoting *Calder v. Bull*, 3 U.S. 386, 3 Dall. 386, 1 L.Ed. 648 (1798)). Nothing about the Legislature permitting a jury instruction when a defendant waives parole implicates the ex post facto prohibition. *See*

*State v. Fortin*, 843 A.2d 974, 1014 (N.J. 2004) (holding that defendant could validly waive protection of *Ex Post Facto* clause in order to obtain jury instruction based on statute which required sentence of life imprisonment without parole for capital murder, and further observing that "[o]ther jurisdictions also have allowed defendants to waive ex post facto challenges to the application of life imprisonment without the possibility of parole sentencing options that took effect after the commission of a capital murder").[2] Furthermore, merely permitting the State and a defendant to agree to reform a sentence from death to life without parole would also not implicate the ex post facto prohibition because this would be only by the agreement by the parties and not punishment set forth by the Legislature for a law violation. I am unaware of any authority, state or federal, that has held that a defendant's desire to intentionally, knowingly, or voluntarily waive his potential to receive parole would in any way implicate an ex post facto prohibition, and to suggest this without any supporting authority is questionable.

Former Section 42.18, subsection 8, is also not implicated by anything I suggest in my opinion. That section addresses cases that discharge though parole. But a defendant may not discharge a life sentence that by definition applies to a person's natural life. Again, the concurring opinion confuses eligibility to seek parole with a defendant's intentional, knowing, and voluntary waiver of his right to seek parole. Eligibility is an entirely different thing than being granted parole. The chances of a defendant confined to life in prison for capital murder who is eligible for parole actually being paroled are slim, at best. That reality is what prompted this appellant to seek waiving the pipe dream of parole for the solid jury instruction that would inform the jury that he would never be released on parole.

Section 508.145 of the Texas Government Code is similarly not implicated by anything in my opinion. *See* Tex. Gov't Code § 508.145. That section describes the eligibility dates for parole. But that section does not mandate that a defendant must request parole or that he cannot intentionally, knowingly, or voluntarily waive his right to parole. To suggest that this section is implicated here is curious.

Lastly, there is no inconsistency between anything in my opinion and Article 44.2511 of the Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 44.2511. That Article applies to sentence reformations by this Court when there is reversible error in the punishment phase of trial. Nothing in that Article would apply to the procedures discussed in this opinion, but it is worth mentioning that the type of sentence reformation that I have in mind ex-

**2.** In *State v. Fortin*, the New Jersey Supreme Court cited a number of cases from other jurisdictions in support of its conclusion that the *Ex Post Facto* clause would not serve as an impediment to a defendant's waiver of parole under these circumstances. *See* 178 N.J. 540, 843 A.2d 974, 1015 (2004) (citing *Furnish v. Commonwealth*, 95 S.W.3d 34, 50–51 (Ky.2002) (observing that defendant may make a "knowing, intelligent and voluntar[ ]ly waiver of any right to attack this statute as a violation of the *ex post facto* prohibition"); *Willie v. State*, 738 So.2d 217, 220 (Miss.1999) (holding that on remand for resentencing "jury should be instructed on all three options available under the amended statute" and if defendant "agrees to a sentence of life in prison without parole, the trial judge should take care to ascertain that [defendant] has validly waived his *ex post facto* rights before accepting the plea agreement"); *State v. McDonnell*, 987 P.2d 486, 494 (Or.1999) (holding that defendant could waive *ex post facto* challenge in order to be sentenced under amended sentencing scheme); *Wade v. State*, 825 P.2d 1357, 1363 (Okla.Crim.App. 1992) (same)).

ists under our law today for other circumstances. *See id.* Article 44.2511 permits reformation to life in prison when a defendant's case has been reversed in the punishment phase of trial for something other than insufficient evidence and the "prosecuting attorney files a motion requesting that the sentence be reformed to confinement for life." *Id.* Thus, whatever concerns the concurring opinion may have about the ability of the State's attorney to alter a jury's determination to sentence a defendant to death should be assuaged by the fact that the Legislature already permits this practice under this Article. *Id.* Nothing in this opinion suggests anything more expansive with respect to the State's ability to make decisions that are in the best interest of society than already exists under our law.

It is extremely concerning that the inequities in our law are shrugged off with a lack of concern for those who are affected. As the Legislature has already observed in its enactment of Article 44.2511, there are times when society's interests are best served by sentence reformations. If a mere suggestion that the Legislature at least consider remedying this problem draws an antagonistic response, it is clear to me that a solution to this problem does not lie in this Court. The solution lies with the Legislature.

I offer my comments in the spirit of hoping that society's best interest may be best served with equitable laws that apply fairly to all people. This opinion is intended as a mere starting point for what I recognize must ultimately be the Legislature's policy decision. Aside from taking into account the equitable considerations affecting all of the concerned parties, such a policy would empower the State by providing more options by which justice for all

could be achieved. With these comments, I join this Court's majority opinion.